SANDBERG, Respondent, vs. THE STATE, Appellant.

*February 22—March 11, 1902.*

*Records of births and deaths: Statutes: Evidence: Parish registers: Records of foreign country: Illegitimacy: Presumptions: "Other material facts:" Identity: Costs.*

.1. Under sec. 4160, Stats. 1898, providing that "any church, parish or baptismal record, . . . in which records are preserved the facts relating to any birth, marriage, or death, including

the names of the persons, dates, places and other material facts, may be admitted as *prima facie* evidence of any fact aforesaid," copies of parish registers of births and deaths, kept in a foreign country, in accordance with its laws, are admissible in evidence under a stipulation that they should have the same effect as if the originals had been produced by the proper custodian, and duly sworn to by him.

2. The regulation of procedure in the certification of documents for evidentiary purposes is wholly in the hands of the legislature, and controlled by the law in force at the time the evidence is offered, and hence in proceedings had after sec. 4160 was enacted, to determine the heirs of one who died before its enactment, the introduction of evidence is controlled by that section.

3. Where the laws of a foreign country require a record of the birth of all children, "illegitimate as well as legitimate," and authorizes certain officials to provide formulas for books which may be considered necessary regarding births, etc., the fact that a public officer did, in the performance of his duty, enter upon such record the marital status of the mother, and thereby inferentially the legitimacy of the child, warrants the inference that the laws of that country require such entry.

4. Under such inference, the marital status of the mother and the legitimacy of the child become material facts in the birth record, and are within the phrase "other material facts" in said sec. 4160, which such record is declared *prima facie* to establish.

5. The evidentiary effect of such record being declared by said sec. 4160, the record of the birth of a child to one declared therein to be a spinster, in the absence of evidence leaning to the conclusion of legitimacy, is sufficient to overcome the *prima facie* presumption of legitimacy which exists in favor of all children, and to support a finding that such child was illegitimate.

6. In such case no presumption exists that the child was thereafter legitimated by a marriage between its natural parents.

7. It seems that where, in such records, there is a duplication of rather unusual christian names, constituting combinations extremely unlikely to occur in different individuals, there is no necessity of evidence, other than the records themselves, to establish *prima facie* the identity of the persons named therein with those whose existence it is material to prove.

8. A certificate from the public records of Chicago established the death of a person of the same name as S. In addition it appeared, among other things, that S. had gone to reside in Chicago; that the attending physician described deceased as a person of the same name, age and nationality as S., giving a

physical description corresponding in many respects, and dif-
fering in none, with that given by persons who knew S. a few
years before; that the deceased had a child of the same name
and corresponding physically with one shown by other testi-
mony to be the child of S.; that a sister of S., about that time,
received a telegram announcing the death of S. and never after-
wards—a period of eight years—heard from or of her. *Held*,
sufficient to support a finding that S. was dead.

9. Where it appears that S. J. W., if living, would be over ninety
years old, the production of a parish record declaring the
death of J. S. E., born W., whose date of birth is identical with
that of S. J. W., justifies the conclusion of the death of S. J. W.,
although the christian names are transposed.

10. The records of a parish establishing the name, date and place of
birth of F. L. W. in 1826, and the records of another parish in
the same country, establishing the death in 1866 of a man of
the same name, born on the same day in the first named parish,
are *held* sufficient to establish the death of the person named in
the first record.

11. The general costs statutes in civil actions do not apply against
the state, and, in the absence of any statute giving express au-
thority, no court is authorized to render judgment for costs
against the state.·

APPEAL from a judgment of the circuit court for Jeffer-
son county: B. F. DUNWIDDIE, Circuit Judge. *Modified
and affirmed.*

One Laura Augusta Armitage (born Sandberg), having
died at Ft. Atkinson, in Jefferson county, intestate, Septem-
ber 11, 1897, her estate was administered by the public ad-
ministrator, and, in absence of any heirs or next of kin, was
escheated, and, in accordance with sec. 3935, subd. 7, Stats.
1898, and sec. 2270, subd. 7, paid over to the state of Wis-
consin,—being $3,375.62 of money, a schedule of personal
effects aggregating about $75, and a house and lot in Ft.
Atkinson,—by final order of the county court of Jefferson
county, dated January 23, 1900. Thereafter the petitioner,
·*Erik Sandberg*, of the kingdom of Sweden, presented to the
county court his petition, alleging himself to be the paternal
uncle and the only surviving next of kin of said intestate,

and demanded refund to him of her said property. The
state being notified, the attorney general appeared, and an-
swered absence of knowledge or information sufficient to
form a belief as to petitioner's rights. The county court or-
dered refund, whereupon the state appealed to the circuit
court. Upon the trial there it was established by evidence
that the intestate was a widow, leaving neither children nor
husband; that she had one sister and no brothers; that she
was born and married in Sweden, and moved to this country
thereafter, but many years ago. It was shown that in 1883
her sister, named Sophia Charlotta Sandberg, visited the in-
testate at her farm in Jefferson county, accompanied by her
child, about two years of age. Evidence was then offered in
the form of a parochial record at the place of residence of
this sister in Sweden of the birth of a daughter, Gunhild
Carolina, on May 20, 1881, to Sophia Charlotta Sandberg,
spinster, which child, by the same record, was registered as
having departed for America on March 21, 1883. This was
accompanied by a parochial record with reference to the
mother, Sophia Charlotta Sandberg, showing her registered
as removing from the parish of Katarina to America on
March 21, 1883, and at that time a spinster, and free to
enter into matrimony. It was proved that the sister passed
by the name, currently, of Charlotta Sandberg, and the
child by the name of Gooney; that later in the year 1883
the sister moved to Chicago, and still later—either in 1883
or early in 1884—the child, Gooney, was taken to her at
that city, where she was then living with a man who, in her
presence, denied being her husband. A death certificate
from the Chicago records was then offered in evidence, cer-
tifying the death, at 228 North Union street, Chicago, on
August 1, 1889, of Charlotte Sandberg, thirty-nine years
old, of Swedish birth. The physician who attended her at
the time of her death described her, which description tallied
closely with that given by those who had been acquainted

with her in Jefferson county when visiting the intestate. He
also testified to the presence of a child from six to nine
years old, the description of which corresponded in consid-
erable measure with the child Gunhild. Evidence was also
offered of the delivery of a telegram to the intestate at ap-
proximately the time when this death took place, the sub-
stance of which was only imperfectly remembered, but in sub-
stance notified her of the death of her sister, and that she
would be buried by the public authorities; at which the in-
testate was very much affected. A witness, who had charge
of the affairs of the deceased, did her business and attended
to her correspondence for her, testified that, so far as he knew,
nothing had ever been heard further of either the sister
Charlotta or the child Gunhild. The petitioner testified
that the father and mother of the deceased were both dead;
that he was a brother of her father, who had six brothers and
sisters, all the rest of whom were dead. He testified also that
the intestate's mother had six brothers and sisters, who, as
appeared by parish records, were all dead. Thereupon a series
of parish records of births and deaths were introduced,
claimed to establish the fact of the death of all of the ma-
ternal uncles and aunts before 1897. Thereupon the circuit
court filed findings to the effect that the intestate had no chil-
dren or descendants, no husband, no father nor mother nor
grandparents; that she never had any brothers; that she had
one sister, who predeceased her, leaving no legitimate chil-
dren; that the child Gunhild was illegitimate. He further
found the existence and death of the maternal uncles and
aunts, and of all the paternal uncles and aunts except the
petitioner, whom he therefore found to be the sole surviving
next of kin, and entered an order or judgment directing that
the state pay to him all of the property and moneys received
from the administrator as aforesaid, together with $20 of
rents thereafter received, and that the state pay to the claim-
ant the amount of his disbursements as taxed. From that

judgment, and the whole thereof, the state brings this appeal.

For the appellant there was a brief by the *Attorney General,* and oral argument by *C. E. Buell,* first assistant attorney general. To the point that there was no competent testimony to warrant the finding that the child Gooney was illegitimate, were cited, *Hermann v. State,* 73 Wis. 248; sec. 4172, Stats. 1898; *Lavin v. Mut. A. Soc.* 74 Wis. 349; 1 Jones, Ev. § 23; *Blackburn v. Crawfords,* 3 Wall. 175, 182, 189; *Weaver v. Leiman,* 52 Md. 708; *Clark v. Trinity Church,* 5 W. & S. 266; 1 Greenleaf, Ev. § 493; *Sitler v. Gehr,* 105 Pa. St. 577; 2 Phillipp's Ev. 280; *Rex v. Clapham,* 4 C. & P. 29; *Burghart v. Angerstein,* 6 C. & P. 690; *Williams v. Lloyd,* 39 Eng. C. L. 595; *Whitcher v. Mc-Laughlin,* 115 Mass. 167; *Strode v. Magowan's Heirs,* 2 Bush, 621; *Caujolle v. Ferrié,* 23 N. Y. 90; *Piers v. Piers,* 2 H. L. Cas. 331. That there was no sufficient competent proof that the sister of deceased was dead, *Oregon S. Co. v. Otis,* 100 N. Y. 446; *Williams v. Brickell,* 37 Miss. 682; *Whilden v. Merchants & P. Nat. Bank,* 64 Ala. 30; *Richie v. Bass,* 15 La. Ann. 668; *Burt v. W. & St. P. R. Co.* 31 Minn. 472; *Adams v. Mille Lacs L. Co.* 32 Minn. 216; *Smith v. Easton,* 54 Md. 138, 143, 146; *U. S. v. Babcock,* 3 Dill. 577.

For the respondent there was a brief signed *R. B. & I. B. Kirkland,* attorneys, and *Judge Oscar Von Koch,* Stockholm, Sweden, of counsel, and oral argument by *R. B. Kirkland.*

DODGE, J. It is not seriously controverted that claimant has established that he is an uncle of the deceased, Mrs. Armitage, nor that the evidence sufficiently negatives the existence of any other kin of equal or superior proximity, except that of the sister, Sophia Charlotta Sandberg, and her daughter, and the legitimacy of that daughter, and the existence of the six maternal uncles and aunts. Much of

the proof as to all of these persons consists in the introduction of copies of parish registers of births and deaths, kept in the kingdom of Sweden, in accordance with its laws, and offered in evidence upon the trial under a stipulation that they should have the same effect as if the originals had been produced by the proper custodian, and duly sworn to by him. The state seems to contend against the admissibility of these documents, although the grounds of objection are not made entirely clear. If they have any relevancy or materiality, their admissibility would seem to be put beyond doubt by sec. 4160, Stats. 1898, which provides:

"Any church, parish or baptismal record, . . . in which record are preserved the facts relating to any birth, marriage or death, including the names of the persons, dates, places and other material facts, may be admitted as *prima facie* evidence of any fact aforesaid."

These documents are both church and parish records, and are shown to have been kept pursuant to the law of Sweden, and to be in the legal custody of the person who produced them. True, this statute was not enacted until after the death of Mrs. Armitage, but it had been enacted and was in full force at the time of the trial. Of course, the regulation of procedure and certification of documents for evidentiary purposes is wholly in the hands of the legislature, and is controlled by the law in existence at the time when the evidence is offered. Such statutes neither create nor impair vested rights, nor in any wise affect obligation of contracts. They regulate procedure merely, and speak from their date with reference thereto. *Hopt v. Utah,* 110 U. S. 574, 590; *Thompson v. Missouri,* 171 U. S. 380. We therefore need not spend time to consider the admissibility of these documents at common law, nor under our statutes as they existed at some earlier time. Neither need we be given pause by the decision of this court in *Lavin v. Mut. A. Soc.* 74 Wis. 349, which merely decided that a baptismal certificate

issued in a foreign country and authenticated in accordance with sec. 4172, Stats. 1898, was not admissible under that section, for the reason that its terms extended only to certificates of births, marriages, and deaths, and therefore did not give admissibility to a certificate of baptism.

Passing from the question of admissibility to the question of probative force, and postponing for the present that of the identity of the persons, the most serious inquiry is whether the declaration in the record of the birth of the infant, Gunhild, that at the time her mother was a spinster, is any evidence of illegitimacy. That inquiry turns primarily upon the force of our statute, which, as above quoted, provides that the record shall be *prima facie* evidence of any material fact stated therein, in this respect extending the efficacy of such records beyond that accorded them at common law according to many decided cases. The question at once arises under this statute whether the marital status of the mother is a material fact in a birth record. The law of Sweden, which is somewhat imperfectly presented in the record, seems to require a record of all "children, illegitimate as well as legitimate, and the names of their *parents* and godfathers and godmothers, . . . with short annotations regarding their burial places, state and capacity, life, and age." It also authorizes certain officials to provide formulas for books which may be considered necessary regarding births, baptisms, deaths, and burials. It thus appears that the laws of Sweden, at least, indicate the importance of preserving in the records the fact of legitimacy and illegitimacy. Little, if any, ingenuity is necessary to suggest reasons for materiality, both public and private. Rights of the individual as against private property and as against other relatives may well be affected thereby; also its rights to local citizenship, protection, or support. Besides this, the information, for statistical purposes, may be very important. The fact that a public officer did, in the perform-

ance of his duty, enter upon the record the marital status of
the mother, and thereby inferentially the legitimacy of the
child, strongly suggests, in absence of any negation, the in-
ference that the laws required such entry; and we certainly
are unable to say that it is so wholly an immaterial circum-
stance as to refute that inference. We must conclude that.
the fact is within the phrase of our statute, "other material
facts," and therefore that the record *prima facie* establishes.
it. Doubtless, the evidence of the certificate is in conflict
with the *prima facie* presumption of legitimacy which exists.
in favor of all children, but the statute declaring the evi-
dentiary effect is without force unless it means that the rec-
ord is sufficient to overcome a mere *prima facie* presump-
tion. If that presumption were aided by any other evi-
dence, the court should lean to the conclusion of legitimacy,
but of such facts there are none in the present case. The
only other evidence bearing on legitimacy which we have is
that about two years after the birth of the child the mother
changed her residence from Sweden to the United States,
unaccompanied by a husband, and that she then passed by
her maiden name of Sandberg. Certainly these circum-
stances tend rather to confirm her spinsterhood than to re-
fute it. We conclude, therefore, that this record was *prima:
facie* evidence that the child, Gunhild, niece of the intestate,
was born while its mother was unmarried, and was there-
fore illegitimate. We can indulge in no presumption that
thereafter it was legitimated by a marriage between its nat-
ural parents, especially in view of the facts shown two years.
later, which are more consistent with the continued spinster-
hood of the mother.

A further question arises and is argued, common to a
large number of these records, as to the necessity of evi-
dence other than the records themselves to establish *prima
facie* the identity of the persons named therein with those
whose existence is material in this case. There is a line of au-

thorities which hold that identity of name alone is always sufficient to establish *prima facie* the identity of persons. *Jackson v. King,* 5 Cow. 237; *Green v. Heritage,* 63 N. J. Law, 455; *Hamsher v. Kline,* 57 Pa. St. 397, 403; *Goodell v. Hibbard,* 32 Mich. 47, 55; *Morris v. McClary,* 43 Minn. 346; 16 Am. & Eng. Ency. of Law (1st ed.), 119. Appellant contends for the exact converse of this rule, namely, that identity of name is never sufficient alone, but the party producing the record must always offer some independent proof of identity; citing *Barber v. Holmes,* 3 Esp. 190; *Morrissey v. Wiggins F. Co.* 47 Mo. 521. Probably neither rule is universal, though the former seems more nearly so according to the weight of authority. In the present case it is not necessary to decide between them, for every record is supplemented by some fact or circumstance in addition to the mere name, although that alone in several instances, we are persuaded, ought to suffice, because of the duplication of rather unusual Christian names, constituting combinations extremely unlikely to occur in different individuals.

The next serious issue is whether the claimant has established the death of the sister Sophia Charlotta Sandberg. To do this he has offered affirmative proof by a legal death certificate and by the testimony of the attending physician that in 1889 there died in Chicago one Charlotte Sandberg. He has also offered, both as confirmatory of the identity of the person who then died and as affirmative proof, the fact that there was delivered to Mrs. Armitage at about this same time a telegram informing her of the death of her sister in Chicago, which she evidently received as authentic, for she was very much affected thereby, as the witness who delivered it to her testifies. These are followed or supplemented by testimony of a gentleman who aided Mrs. Armitage with her correspondence and business, and was in a position, probably, to know if the fact had been otherwise, that he never knew of her receiving any communication from or information of

her sister during the rest of her life, a period of something over eight years.

. As to the effect of the proof, undisputed, of the death of a Charlotte Sandberg in Chicago, there is only the question of identity. It is proved by the testimony of the attending physician that this woman described herself as of Swedish birth, and as of the same age as Mrs. Armitage's sister; who, by the way, it is shown commonly passed by the name of Charlotta, instead of Sophia. He also gives a physical description of her, which corresponds in many respects with the physical description given of Mrs. Armitage's sister by those who were acquainted with her six years before in Jefferson county, and differs in none. Further, the woman who died had a little girl of about the age of Gunhild, and who had certain physical characteristics corresponding with those remembered by her acquaintances in Jefferson county. It is also established that Mrs. Armitage's sister Charlotta went to reside in Chicago in the latter part of 1883, and so continued for some time thereafter. From these facts we certainly are unable to say that the finding of the court that the woman who died in Chicago was Mrs. Armitage's sister is so without support in the evidence that we must set it aside.

The evidence with reference to the death of the six maternal uncles and aunts of Mrs. Armitage is wholly documentary. Their dates of birth were from 1811 to 1826, as appears by the parish records of Enkoping, the place of residence of their parents. Upon the same record where those births are narrated appears the death of three at ages ranging from one to five years. Of the identity of these, obviously, there can be no serious doubt. The death of the eldest aunt, Sophia Johanna Warman, born the 2d of December, 1811, is claimed to be established by the record from another parish, declaring the death of Johanna Sophia Erwall, born Warman, whose date of birth was identical with that of the aunt. The identity of the person who died with the aunt is not very

perfectly established. The identity of the two Christian names
is, of course, striking, although they are transposed. The ex-
act date of birth is also striking, and, in view of the further
consideration that this aunt was born in 1811, and, if alive
to-day, must be over ninety years of age, we think the court
was justified in reaching the conclusion of her death. To
prove the death of the uncle Josef Leontius Warman is of-
fered the record of a Stockholm hospital parish that a person
of exactly the same name and of the same age there died in
February, 1841. In view of the antiquity of these events
and coincidence of the three names and the age, we think that
the identity is sufficiently established. As to the uncle Frans
Leonard Warman, born October 1, 1826, at Enkoping, there
are offered the records of another parish that a man of the
same name, born the same day at Enkoping, died June 26,
1866. These three elements of identification—name, date of
birth, and place of birth—would seem entirely sufficient.

We therefore reach the conclusion that the trial court was
justified in finding with the claimant on all these controverted
issues of fact, as also upon the ultimate issue to the effect that
he is the only next of kin to the deceased, Mrs. Armitage, and
properly adjudged surrender of the estate to him.

The judgment for recovery of costs against the state is
erroneous. No court is authorized to render judgment for
costs against the sovereign state, in absence of statute giving
express authority. *U. S. v. Barker,* 2 Wheat. 395; *U. S. v.
Ringgold,* 8 Pet. 150, 163; *Stanley v. Schwalby,* 162 U. S.
255, 272; *State v. Smith,* 52 Wis. 134. We find no statute
giving such authority. The doubt expressed by RYAN, C. J.,
in *Noyes v. State,* 46 Wis. 250, 252, whether general cost
statutes might apply against the state in civil actions is
readily resolved by reference to the rule that general statutes
are not to be construed to include, to its hurt, the sovereign.
*Dollar S. Bank v. U. S.* 19 Wall. 227, 239; *U. S. v. Verdier,*
164 U. S. 213, 219. The error thus committed in no wise

affects the correctness of the judgment in other respects, and can be corrected here. ·

*By the Court.*—The judgment appealed from. is modified by striking therefrom the award of costs, and, as so modified, is affirmed. No costs will be recovered by either party in this court.