In re the Estate of Frank Buckner Thompson:

Adelaide DiBenedetto, Barbara Trumbull, Dorothy Roth, Kelly Kline, Kenneth Wright, and Elizabeth Wright, Appellants,

v.

Cynthia J. Jaskolski, as personal representative, Respondent.

Court of Appeals

*No. 01–2189. Oral argument January 7, 2003.—Decided March 4, 2003.*

2003 WI App 70

(Also reported in 661 N.W.2d 869.)

On behalf of the appellants, the cause was submitted on the briefs of *Jeffrey A. DeMatthew* of *Becker, French & DeMatthew*, of Racine, joined by *Thomas F. Raasch*, guardian ad litem of *Raasch Professional Offices*, of Milwaukee, and a supplemental brief of *Maureen A. McGinnity* of *Foley & Lardner*, of Milwaukee. There was oral argument by *Maureen A. McGinnity* and *Thomas F. Raasch*.

On behalf of the respondent, the cause was submitted on the brief and supplemental brief of *O. Thomas Armstrong, Jr.* of *Quarles & Brady LLP*, of Milwaukee. There was oral argument by *O. Thomas Armstrong, Jr.*

Before Wedemeyer, P.J., Fine and Schudson, JJ.

¶ 1. SCHUDSON, J. The five children and one grandchild of Kenneth Wright (a/k/a Kenneth Thompson or Kenneth Wright Thompson), who was the son of Frank J. Thompson (FJT), appeal from the circuit court order, following an evidentiary hearing in probate, concluding that they had failed to establish that they were the lawful heirs of their alleged uncle/granduncle,

Frank B. Thompson (FBT).[1] The appellants argue that the court erred in concluding that: (1) the evidence rebutted the birth-certificate-based presumption, under Wis. Stat. § 891.09 (1999–2000)[2] and Wis. Stat. § 69.21(1)(c),[3] that FBT was a marital child of FJT; (2) paternity proceedings to establish whether FBT was a nonmarital child of FJT were barred by the statute of limitations; and (3) the actions of the personal repre-

[1] Here, and throughout this opinion, this court will attempt to clarify the facts and law of this rather complicated case by highlighting the most essential points in the text while elaborating additional details in the footnotes. Thus, at the outset, we note that the circuit court order actually addressed many additional issues, concluding:

It is hereby ORDERED that

Frank Buckner Thompson was not the marital child of Frank J. Thompson and Laura Buckner,

Paternity proceedings are barred,

There is no sound reason to order the initiation of an equitable action to establish paternity,

Frank Buchner Thompson's paternity was not established,

The petitioners are not the heirs of Frank Buckner Thompson,

The caption of this case is corrected to reflect the spelling of Buckner, and

The personal representative is not removed.

Here, also, for the first of many times, we encounter what could be the hopelessly confusing confluence of similar names and different spellings. Taking certain literary license, we shall abbreviate and spell names in a manner most likely to minimize the confusion.

[2] All references to the Wisconsin Statutes are to the 1999–2000 version unless otherwise noted.

[3] Wisconsin Stat. § 891.09, in relevant part, provides:

sentative of the estate were reasonable and, therefore, did not require her removal.

¶ 2. We conclude that the circuit court's finding that the evidence rebutted the birth-certificate-based presumption was not clearly erroneous; therefore, the court did not err in concluding that the appellants had failed to prove that FBT was a marital child of FJT. We also conclude, however, that the circuit court erred in ruling that the statute of limitations foreclosed the appellants from gaining a definitive determination of whether FBT was a nonmarital child of FJT. And finally, while concluding that the circuit court correctly denied the appellants' request to remove the personal representative, we also conclude that the personal representative, in opposing the appellants' efforts to gain a definitive determination of their relationship to FBT, failed to reasonably fulfill her duty to identify the estate's lawful heirs. Accordingly, we affirm in part, reverse in part, and remand this matter to the circuit

---

**Records of births, stillbirths, fetal deaths, deaths and marriages. (1)** RECORDS AS EVIDENCE. The record of any . . . birth . . . shall be received as presumptive evidence of the . . . birth . . . so recorded.

**(2)** CHURCH AND DOCTOR'S RECORDS. Any church, parish or baptismal record, and any record of a physician or a person authorized to solemnize marriages, in which record are preserved the facts relating to any birth, . . . including the names of the persons, dates, places and other material facts, may be admitted as prima facie evidence of any fact aforesaid . . . .

WISCONSIN STAT. § 69.21(1)(c), a portion of the statute relating to copies of vital records, *see* WIS. STAT. § 69.21, provides, in part, that, with certain exceptions inapplicable to this appeal, "[a]ny certified copy of a vital record," including birth certificates, "shall be deemed the same as the original vital record and shall be prima facie evidence of any fact stated in the vital record . . . ."

729

court to make that determination and complete the probate proceedings consistent with this decision.

## I. BACKGROUND

¶ 3. Are the appellants the nieces, nephew, and grandniece of FBT? If so, they are his lawful heirs. Thus, at a two-day circuit court hearing, the appellants and personal representative attempted to answer that seemingly simple question. The evidence, however, established that the answer was anything but simple.

¶ 4. As recorded on his birth certificate, FBT was FJT's "[l]egitimate" son. And if FBT was FJT's son—legitimate or not—FBT also was Kenneth Wright's half-brother and the appellants' uncle/granduncle. Therefore, if the birth certificate was accurate in identifying FJT as the father, the appellants would be FBT's heirs. The following chart, similar to the one provided to this court at oral argument, clarifies the possible relationships.

¶ 5. According to the evidence presented at the circuit court hearing, FJT died in 1953. FBT was born on March 24, 1908 and died, intestate, on May 17, 1999, leaving no known heirs. Soon after FBT's death, Cynthia J. Jaskolski became the personal representative of

his estate and discovered that FBT had left assets of almost one million dollars. She initiated probate proceedings on June 28, 1999. About one year later, the appellants petitioned for a determination of heirship. If they could succeed in establishing their relationship to FBT, they would inherit; if not, the State of Wisconsin school fund would receive the proceeds of FBT's estate. *See* WIS. STAT. § 852.01(3).[4]

¶ 6. Shortly after the appellants petitioned for a determination of heirship, the personal representative communicated with the circuit court, by letter to a probate court commissioner, "to add some insight into the life of [FBT], and . . . try to convey what his wishes were." While acknowledging that "it seems if we follow the law, the estate will pass to the State of Wisconsin school fund," she wrote that FBT, "[o]n numerous occasions . . . would talk about what would happen to his money when he died," and asked that the court "grant [FBT's] wishes." She explained: "His first wish was to build a park in honor of his mother, Laura Buchner . . ., in Waukesha. Secondly, he wanted money to go to Marquette University, in his name, for scholarships."

¶ 7. In her letter, the personal representative also recounted her efforts "to find a will, a note, anything that would provide further direction," and "to help locate people who could tell us more about our friend, [FBT], and any family he might have had in the past." Summarizing her research and findings, the personal

---

[4] WISCONSIN STAT. § 852.01(3) provides: "ESCHEAT. If there are no heirs of the decedent under subs. (1) and (2) [relating to basic rules for intestate succession], the net estate escheats to the state to be added to the capital of the school fund." The State of Wisconsin has declined to participate in either the circuit or appellate court proceedings in this case.

representative expressed why, despite the birth certificate, she believed FBT was not the marital child of Laura Buchner and FJT. In part, she explained:

> At the age of 19, Laura [Buchner] was pregnant with [FBT]. [FJT] was nine years older. Because of circumstances and the comments by many different people, I do not believe Laura Buchner and [FJT] were ever married. I believe Laura took his name but he never contributed to the emotional or financial support of [FBT]. There is also no record of [FJT] recognizing [FBT] as his son. He does not acknowledge him in his will nor is he mentioned in [FJT]'s death notice as a surviving son — but Kenneth, another son, is mentioned.
>
> . . . .
>
> In [FBT]'s papers we found the marriage license of Laura Buchner and Harry Gibson, and a license for Laura Buchner and a Walter Bush in Florida. Strange there was not a marriage license for Laura Buchner and [FJT]. Laura Buchner lied on her marriage license to Harry Gibson. She claimed to be 11 years younger. She also lied on Harry Gibson's headstone, making him 10 years older than he really was. Because of these lies and other information, I believe Laura Buchner lied on the birth certificate of [FBT], saying that he was legitimate. I believe that she also assumed the Thompson name to save face in 1908.
>
> . . . In 1902[, FJT] had a son named Kenneth, and in 1908[, when Laura Buchner gave birth to FBT,] he may [have] found himself in another situation he could not, or would not, handle.

¶ 8. Based on FBT's birth certificate, the appellants claimed they were FBT's heirs. Alternatively, they sought an order requiring the personal representative to seek the court's determination of FBT's paternity.

The personal representative opposed their efforts. She maintained that FBT was a nonmarital child, that his paternity had not been determined, and that the statute of limitations precluded further proceedings to make that determination.

¶ 9. Following the evidentiary hearing, the circuit court issued a comprehensive decision containing its factual findings and legal conclusions. The decision noted that the evidence had developed, in part, from a "skilled, meticulous and extensive" search for heirs—a search that relied on numerous documents dating back more than one hundred years and exposed "the more conservative societal judgments of earlier generations and insights into the personal lives of various persons now deceased." Emphasizing "the force of the stigma attached to childbirth outside of marriage one hundred years ago," the court found many facts undercutting the birth-certificate evidence.

- FJT's "proof of heirs," filed in probate proceedings following his death in 1953, named his widow, one son, Kenneth Wright, and "none others" as his heirs.

- FJT's will, while making bequests to several people, made no reference to Laura Buchner or FBT.

- While public records confirmed FJT's marriage to Adelaide Wright, no records that could have confirmed his marriage to Laura Buchner had been found, despite an extensive, multi-state search.

- Similarly, while public records confirmed FJT's divorce from Adelaide Wright, no records that could have confirmed his divorce from Laura

Buchner had been found, despite the fact that a divorce would have been required prior to their respective marriages to others in the years after FBT's birth.

- Two marriage certificates, found in FBT's personal effects, confirmed two marriages of Laura Buchner, neither of which was to FJT.

- FBT's birth certificate, containing information presumably provided by Laura Buchner, listed "Laura Bushner"[5] as the mother.

- When FBT was born, it was uncommon for married women to retain their maiden names and, therefore, Laura's use of "Bushner" on the birth certificate may have indicated that she was unmarried. (As we will explain, however, the latter portion of this finding is clearly erroneous. *See* ¶ 17.)

- When FBT was born, most babies were delivered at home, but of the twenty-six births reported by

---

[5] The circuit court's decision distinguishes "Buchner," "Buckner," and "Bushner," and explains:

> The closeness between the names Buchner and Buckner has caused some confusion in the records. While this does not affect the determination of the issues . . ., it is best to clarify . . . the use of these names. According to records submitted, Buckner Thompson's mother's maiden name was Buchner. She gave the last name "Bushner" at the time of Buckner Thompson's birth. Laura later married John Buckner. It is this name, Buckner, that [FBT] apparently chose as his middle name in 1971.

The court also noted that, in 1971, the birth certificate was amended, changing FBT's name from "Franklin Thompson" to "Frank Buckner Thompson," and changing "Bushner" to "Buckner."

the *Milwaukee Sentinel* on March 31, 1908, only FBT's took place in a hospital.

- FBT was born in a Milwaukee hospital, at what then would have been an imposing distance from Laura Buchner's Waukesha home.

- No evidence indicated the existence of any financial support or personal contact between FJT and FBT. They had, the court found, "no connection in life" with the possible exception of what may have been their presence at the funeral of Adelaide Wright's brother, the details of which were unknown except that if FBT was there, "he attempted no contact with the family."

- In his communication with the personal representative over many years, FBT often spoke of his mother but never of a father, and he never attempted to establish a relationship with FJT or any of FJT's descendants.

- A distant cousin of FBT testified, as summarized by the court, that at a family reunion during the 1930's, "Laura's very presence . . . created a stir because she had given birth out of wedlock—to [FBT]."

¶ 10. Countervailing evidence suggested that FJT may indeed have been FBT's father, though perhaps illegitimately. The same cousin who told about the family reunion also testified that, according to various relatives, "sort of family history" held that FJT was FBT's father. FBT always used the "Thompson" name and, when he applied for a social security card, FBT identified FJT as his father. And FBT's personal effects included a copy of FJT's obituary, published in the *Waukesha Freeman* in 1953. The court determined, however, that this evidence, even in combination with

the birth certificate, was "insufficient . . . by any standard of proof" to establish that FJT and FBT "were father and son."

¶ 11. The circuit court concluded, therefore, that the evidence rebutted the presumption that the birth certificate proved that FBT was the marital child of FJT. In part, the court explained:

> The social stigma attached to having a child outside of marriage during the early years of the past century . . . doubtless created an incentive for Laura to protect herself and her child. She did this by giving birth in a Milwaukee hospital rather than in her Waukesha home, claiming her son was legitimate, perhaps misspelling her own name, and providing the name of a father. Whether or not the name she provided was the person she believed to be her child's father[] and[,] if so, whether she was correct in her belief; [and] whether and what kind of relationship she may have had with [FJT,] are proper subjects for conjecture only.

¶ 12. The court also concluded that it could not require the personal representative to initiate proceedings, under WIS. STAT. § 767.45(1)(e),[6] to determine paternity in this case, for either or both of two reasons. First, WIS. STAT. § 893.88, providing that "an action for the establishment of the paternity of a child shall be

---

[6] In relevant part, WIS. STAT. § 767.45 provides:

**Determination of paternity.** (1) The following persons may bring an action or motion, including an action or motion for declaratory judgment, for the purpose of determining the paternity of a child for the purpose of rebutting the presumption of paternity under s. 891.405 [relating to presumption of paternity based on acknowledgment] or 891.41 (1) [relating to presumption of paternity based on marriage]:

(a) The child.

(b) The child's natural mother.

commenced within 19 years of the date of the birth of the child or be barred," foreclosed such proceedings. Second, § 767.45 is discretionary and the personal representative, in deciding not to pursue any further effort to determine FBT's paternity, acted appropriately. The circuit court explained:

> The personal representative's disinclination to initiate paternity proceedings, even if not barred by statute, is reasonably based. She knew [FBT] for many years, while the alleged heirs did not. [FBT] showed no inclination in 91 years to explore a relationship with [FJT]. The personal representative testified that [FBT] often spoke of [ ]his mother, but never of his father. And the alleged heirs are not minors to whom [FBT] had a support obligation.

> [FJT] also had many years to determine whether or not he had a child out of any relationship that may have existed between him and Laura Buckner. There is no indication that any of them, [FJT], Laura Buckner, or [FBT] ever attempted to form a relationship or even to contact each other. The connection between [FJT] and [FBT], based as it is on a 1908 birth certificate, is extremely tenuous.

¶ 13. The circuit court also concluded that FBT's nonmarital paternity had not been established by any other means under WIS. STAT. § 852.05. And finally, the court, commenting that the personal representative

---

(c) Unless s. 767.62 (1) [relating to conclusive determination of paternity based on voluntary acknowledgment] applies, a man presumed to be the child's father under s. 891.405 or 891.41 (1).

(d) A man alleged or alleging himself to be the father of the child.

(e) The personal representative of a person specified under pars. (a) to (d) if that person has died.

had not "waver[ed] from her duty to protect the estate from invalid claims," and had "discharged her responsibilities diligently," concluded that, under WIS. STAT. § 857.15,[7] the evidence established no basis for removing her.

## II. DISCUSSION

*A. The Circuit Court Correctly Concluded that the Evidence Rebutted the Birth-Certificate-Based Presumption that FBT Was the Marital Child of FJT.*

¶ 14. The appellants first argue that the circuit court erred in determining that FBT was not the marital child of FJT and Laura Buchner. They emphasize that, under WIS. STAT. § 891.09, a birth certificate is "presumptive evidence of the . . . birth . . . so recorded," *see* WIS. STAT. § 891.09(1), and is "prima facie evidence of any fact" on the birth certificate "relating to . . . the names . . . and other material facts," *see* WIS. STAT. § 891.09(2). They further note that, under WIS. STAT. § 69.21(1)(c), a birth certificate "shall be prima facie evidence of any fact stated" therein. Therefore, the appellants contend, FBT's birth certificate, listing him as the "[l]egitimate" son of FJT and Laura Buchner,

---

[7] In relevant part, WIS. STAT. § 857.15 provides:

When a personal representative becomes incompetent, disqualified, unsuitable, incapable of discharging the personal representative's duties . . ., the court shall remove the personal representative. When any personal representative has failed to perform any duty imposed by law or by any lawful order of the court . . ., the court may remove the personal representative. When grounds for removal appear to exist, the court on its own motion or on the petition of any person interested shall order the personal representative to appear and show cause why the personal representative should not be removed.

738

proved that he was the marital child of FJT and Laura Buchner. The appellants maintain that the court erred in concluding that the evidence rebutted the presumption that FBT was the marital child of FJT.[8]

---

[8] The personal representative responds by first offering the intriguing argument that, notwithstanding the express provisions of WIS. STAT. § 891.09 and WIS. STAT. § 69.21(1)(c), the birth certificate was not entitled to presumptive evidentiary power for the propositions the appellants claim; rather, that it only established the prima facie evidence of FBT's birth and whatever other recorded data were verifiable by the doctor delivering the baby.

The personal representative's position is well reasoned. After all, a delivering doctor is virtually certain to be able to document the fact, time, and place of birth as well as the identity of the mother. That same doctor, however, usually would have no choice but to rely on information from the mother or others regarding the father's identity or an assertion of legitimacy. Why then, the personal representative would ask, should the same presumptive power attend the fact of birth *and* "the facts relating to any birth," under WIS. STAT. § 891.09(2)? Or, formulated a bit differently, why, logically, would the identification of the father on a birth certificate be deemed a fact "relating to" the birth where, typically, the doctor does not verify that information?

Here, because the circuit court applied the presumption without drawing such distinctions, and because we affirm the circuit court's conclusion that the evidence rebutted the presumption, this issue is not pivotal in this appeal. Nevertheless, because the issue may be inextricably connected to a circuit court's consideration of evidence in cases like the instant one, and because the parties have thoroughly and thoughtfully addressed it, we offer four observations.

First, "facts *relating to* any birth," *see* WIS. STAT. § 891.09(2) (emphasis added) and "*any* fact stated in the vital record," *see* WIS. STAT. § 69.21(1)(c) (emphasis added), seem so broad as to discourage the fine distinctions the personal representative

¶ 15. WISCONSIN STAT. § 903.01, in relevant part, provides:

> [A] presumption . . . created by statute, including statu-
> tory provisions that certain basic facts are prima facie

would seek. Indeed, more than one hundred years ago, the supreme court so concluded. *See Sandberg v. State*, 113 Wis. 578, 584–85, 89 N.W. 504 (1902) (In an action by a Swedish citizen claiming to be the paternal uncle of a Wisconsin resident who had died intestate, and seeking the refund of property escheated to the State of Wisconsin, "church and parish records" from Sweden established not only the fact of birth, but the "evidence of illegitimacy" because "the marital status of the mother is a material fact in a birth record" under the recently enacted Wisconsin statute affording prima facie effect to "any material fact stated" in such documents of birth.).

Second, while in some cases the failure to draw such distinctions could result in certain facts gaining presumptive power that they do not seem to deserve, in many more cases a failure to give all the recorded facts the same presumptive power would invite unnecessary litigation over matters that, many years after the fact, could be costly and difficult to resolve.

Third, the statutory presumption does not end the issue. Where, as here, evidence may rebut the presumption, courts can consider that evidence.

And fourth, when measuring whether evidence rebuts the presumption in a case like this one, courts, hopefully, will use common sense. When they do, they will recognize that, logically, the evidence needed to rebut the presumption of different facts will vary according to the facts and circumstances of each case. Obviously, for example, evidence to rebut the fact *of birth* would have to be most impressive, to say the least. But, just as obviously, evidence needed to rebut the presumption *of the identity of the father* in many cases would be far less absolute. And, interestingly enough, here again the supreme court has considered just such a circumstance. *See Schmidt v. Schmidt*, 21 Wis. 2d 433, 437–41, 124 N.W.2d 569 (1963) (In a divorce case

evidence of other facts, imposes on the party relying on the presumption the burden of proving the basic facts, but once the basic facts are found to exist the presumption imposes on the party against whom it is directed the burden of proving that the nonexistence of the presumed fact is more probable than its existence.

In this case, it is undisputed that the appellants proved "the basic facts"—the existence and authenticity of FBT's birth certificate and its listing of FJT as his father. Thus, under WIS. STAT. § 903.01, the burden shifted to the personal representative to demonstrate

---

where paternity of one of the children was at issue, and where the husband and wife testified that their embittered relationship had caused them to cease sexual relations with each other such that the husband could not have been the father, and where the wife testified that her husband's name had been entered on the birth certificate and baptismal certificate as a matter of convenience, and even where, according to the wife, the doctor who delivered the child was aware of the facts concerning the child's paternity, "the designation of [the husband] as the father of the child on the birth certificate and the baptismal certificate [was] of very minor significance in establishing paternity," and the trial court erred in concluding that the presumption of legitimacy had not been overcome.).

The personal representative also argues that WIS. STAT. § 891.09(2) is inapplicable to this case because it pertains to church and doctor's records, not to birth certificates. She contends that although birth certificates are signed by doctors, they are not "doctors' records." *See* WIS. STAT. § 891.09(2). Instead, she maintains, only WIS. STAT. § 891.09(1), referring, in part, to "[t]he record of any . . . birth" applies. Reading the subsections of the statute together, *see State ex rel. Sielen v. Circuit Court for Milwaukee County*, 176 Wis. 2d 101, 110, 499 N.W.2d 657 (1993) ("court should use each part of a statute in conjunction with the others to create a harmonious whole"), we draw no such distinction and see no substantial way in which it would affect the issues in this appeal.

that "the nonexistence of the presumed fact"—that FBT was the marital child of FJT—was "more probable than its existence." The circuit court accepted the presumptive prima facie weight of the birth certificate information. It concluded, however, that "[t]he remaining evidence more than suffice[d] to prove conclusively that [FBT] was not a marital child."

■

¶ 16. "Findings of fact shall not be set aside unless clearly erroneous, and due regard shall be given to the opportunity of the trial court to judge the credibility of the witnesses." WIS. STAT. § 805.17(2). Where the trial court draws a reasonable inference from established facts, we must accept that inference even if other reasonable ones could have been drawn. *Pfeifer v. World Serv. Life Ins. Co.*, 121 Wis. 2d 567, 571, 360 N.W.2d 65 (Ct. App. 1984).

■

¶ 17. The appellants challenge various aspects of the circuit court's factual findings and inferences. Correctly, they argue that one finding was clearly erroneous —that because it was uncommon for married women to retain their maiden names, Laura's use of "Bushner" on the birth certificate may have indicated that she was unmarried. The birth certificate, however, refutes the court's interpretation; the line on which "Bushner" appears follows a heading, "Full Maiden Name."

¶ 18. Far less convincingly, the appellants also contend that the court drew improper inferences—that Laura provided the information recorded on the birth certificate (they argue that, just as likely, FJT was present at FBT's birth and provided the information); that a birth at a Milwaukee hospital may have reflected Laura's desire to conceal the birth (they view that as purely speculative); and that the absence of marriage

and/or divorce documentation established that FJT and Laura never married (they minimize that given FJT's extensive travels, his history of elopement, abandonment, and effort to conceal his marriage to Adelaide Wright, and the lack of centralized systems allowing for a complete document search). They also dismiss the cousin's account of the family reunion as "the twice-removed hearsay testimony of a witness who was a child at the time."

¶ 19. The appellants' arguments are not persuasive; they do little more than expose the uncertainty necessarily surrounding the circuit court's analysis of events occurring in 1908. While suggesting why the circuit court could have viewed the evidence differently, the appellants have provided nothing to establish that the court should have done so. While intimating that some of the court's inferences were speculative, the appellants have countered only with even more speculative possibilities. In doing so, they fail to acknowledge that the circuit court's decision, while not based on definitive historical data, reflects a thoughtful effort to place century-old events in historic context.

¶ 20. So, for example, while the record does not absolutely establish why, in that single journalistic slice of 1908, FBT's birth was the only one of twenty-six reported births to take place in a hospital, and why Laura would have traveled from Waukesha to Milwaukee for the delivery, the court's inference is reasonable. It makes sense, by virtue of both its consistency with other evidence and its sensitivity to current, generally accepted understanding of the mores of that time. The appellants provide nothing in law or logic that would allow us to reject the court's findings and inferences.

¶ 21. The circuit court's factual findings and inferences are firmly grounded in the evidence. Except for

the maiden-name mistake, none is clearly erroneous and, we conclude, that mistake, standing alone, is relatively insignificant in light of all the evidence. Accordingly, we affirm the circuit court's order to the extent that it determined that FBT was not the marital child of FJT.[9]

---

[9] The appellants also argue that, even if the evidence did not establish that FBT was the marital child of FJT, *"all* dispositive evidence received in this case on this issue is to the effect that [FJT] was [FBT's] father." Further, they assert that "[e]ven the [p]ersonal [r]epresentative does not argue otherwise, and in fact implies that such is her belief in the *ex parte* letter she sent directly to the court."

The appellants are incorrect. The personal representative makes no such concession and her letter to the probate court commissioner emphasized, in part, that she had found "no proof" that FBT was the nonmarital child of FJT.

The evidence was mixed. Understandably, however, for essentially the same reasons it concluded that the evidence rebutted the presumption that FBT was the marital child of FJT and Laura Buchner, the court also concluded that "[t]he identity of [FBT's] father was not established." The court explained:

> To conclude from this record even that [FJT] was *probably* [FBT]'s father would be to speculate. The circumstances that may have led Laura to name [FJT] as her child's father are wholly unknown. There was no connection in life between [FJT] and [FBT] . . . . The evidence, taken together, is insufficient to conclude by any standard of proof that [FJT] and [FBT] were father and son.

The appellants acknowledge that, in the circuit court, they neither raised nor argued any challenge to this aspect of the decision. Instead, they primarily pursued their efforts to establish paternity based on the birth certificate and, failing that, to gain a definitive determination of paternity based on the potentially definitive evidence they urged the court to order the personal representative to seek. Because we are remanding this case for the circuit court's consideration of such additional

## B. The Circuit Court Erred in Concluding that Further Proceedings to Determine Paternity Were Foreclosed by the Statute of Limitations and by the Personal Representative's Discretionary Decision

■

¶ 22. The appellants argue that the circuit court erred in concluding that further proceedings to determine FBT's paternity were foreclosed: (1) by the statute of limitations, WIS. STAT. § 893.88;[10] and (2) by what the court viewed as the personal representative's reasonable, discretionary decision, under WIS. STAT. § 767.45, to not seek a determination of FBT's paternity. The appellants are correct.

---

evidence to definitively determine whether FJT was the biological father of FBT, we need not comment further on this portion of the court's decision.

[10] On appeal, as in the circuit court, the parties initially presented intricate arguments reflecting their respective views of the statutory history of paternity actions and statutes of limitations affecting them, the possible constitutional right to bring such actions notwithstanding statutory limitations, and the application, or retroactive application, of WIS. STAT. § 893.88. At oral argument before this court, however, we asked the parties to file supplemental briefs addressing a distinct issue—whether a "*motion* to determine" paternity, *see* WIS. STAT. § 767.45(1), is foreclosed by a statutory restriction on an "*action* for the establishment" of paternity, *see* WIS. STAT. § 893.88— resolution of which, we suspected, would obviate the need to travel the parties' tortuous trail. The parties have done so and we have considered the very helpful guidance they have presented.

The parties also addressed whether the appellants had waived consideration of this issue. In her supplemental brief, however, the personal representative advised this court that she would no longer oppose this court's consideration of the action/motion issue.

### 1. The Statute of Limitations

¶ 23. WISCONSIN STAT. § 893.88 provides, in part, that "an action for the establishment of the paternity of a child shall be commenced within 19 years of the date of the birth of the child or be barred." Whether § 893.88 applies to a given set of circumstances to foreclose further proceedings to determine paternity is a legal issue subject to *de novo* review. *See James A.O. v. George C.B.*, 182 Wis. 2d 166, 176, 513 N.W.2d 410 (Ct. App. 1994). We conclude that, in the instant case, the statute of limitations is inapplicable and, therefore, does not preclude further probate proceedings during which FBT's paternity will be determined.

¶ 24. The interpretation and application of a statute present questions of law subject to *de novo* review. *Schneider v. Schneider*, 150 Wis. 2d 286, 289, 441 N.W.2d 335 (Ct. App. 1989) (interpreting and applying WIS. STAT. § 852.05(1)). Where the terms of a statute are clear and unambiguous, we apply them as written without any need to resort to statutory history or additional authority. *Id.* Here, the words of the statutes are clear.

¶ 25. WISCONSIN STAT. § 852.05(2), in relevant part, provides that "[p]roperty of a nonmarital child passes in accordance with" Wisconsin's statutory rules of intestate succession applicable to marital children "except that . . . the father's kindred can inherit only if the father has been adjudicated to be the father in a paternity proceeding under ch. 767 [Actions Affecting the Family]." As noted, under ch. 767, Wisconsin law allows various persons including a personal representative to "bring an action *or motion* . . . for the purpose

of determining the paternity of a child." *See* ¶ 12 n.6, above; Wis. Stat. § 767.45(1) (emphasis added). Thus, by their explicit terms, §§ 852.05(2) and 767.45(1) anticipate that "a paternity proceeding" may include a personal representative's "motion . . . for the purpose of determining" the paternity of a deceased whose kindred's right to inherit depends on that determination.[11]

¶ 26. Such a "motion" is not an "action." A "motion" may be nothing more than "[a]n application to [a] court for an order." *See* Wis. Stat. § 802.01(2). An "action," however, as used in the Wisconsin statutes, means " 'a lawsuit brought in a court' " and "denotes the entire controversy at issue." *Gowan v. McClure*, 185 Wis. 2d 903, 912, 519 N.W.2d 692 (Ct. App. 1994) (quoted source omitted). *See also Ruediger v. Sheedy*, 83 Wis. 2d 109, 121, 264 N.W.2d 604 (1978) (quoting *State ex rel. Ashley v. Circuit Court*, 219 Wis. 38, 43, 261 N.W. 737 (1935)) (" 'An action is an ordinary proceeding in a court of justice by which a party prosecutes another for the enforcement or protection of a right, the redress or prevention of a wrong, or the punishment of a public offense . . . .' "). Thus, Wis. Stat. § 893.88, limiting only "an action for the establishment of . . . paternity," does

---

[11] At this point in the analysis, two clarifying reminders may be helpful. First, a "child" under Wis. Stat. § 767.45(1) may be an adult child, *see James A.O. v. George C.B.*, 182 Wis. 2d 166, 172, 513 N.W.2d 410 (Ct. App. 1994), and, as in this case, may be deceased, *see* Wis. Stat. § 767.45(1)(e). Second, under Wis. Stat. § 852.05(2), a "paternity proceeding under ch. 767," may take place in the course of probate proceedings. *See* Black's Law Dictionary 1221 (7th ed. 1999) ("Proceeding" may be defined as "[a]n act or step that is part of a larger action.").

not preclude a motion for the purpose of determining paternity in a probate proceeding.

¶ 27. We anticipated just such a circumstance in *James A.O.* In that case, the appellants, James and his mother, brought a constitutional challenge to the circuit court's dismissal, under Wis. Stat. § 893.88, of their "action" to adjudicate James' paternity. *James A.O.*, 182 Wis. 2d at 170. Rejecting their challenge, we concluded that the statutory requirement that a paternity "action" be filed within nineteen years of a child's birth was constitutional. *See id.* at 180. We carefully clarified, however, that while § 893.88 precluded such an "action," it would not necessarily prevent James from seeking the determination of his paternity in the course of a different proceeding. We explained:

> [T]he record in this case includes nothing that would carry James' concerns outside the purely speculative realm. Although he points to potential education and business loans, as well as inheritance and health concerns, he offers nothing to establish that those interests are or can be unalterably undermined by the limitation he challenges . . . . *[T]he fact that he has failed to [protect those interests through a formal adjudication of paternity] does not preclude his opportunity to prove paternity in judicial or other forums that may have to consider such interests. The fact that a § 893.88 . . . adjudication no longer is available to James does not mean that, for his pursuit of other interests, he would be foreclosed from proving paternity to the satisfaction of future fact-finders.*

*Id.* at 181–82 (emphasis added; footnotes omitted). In fact, in a footnote, we specified that "intestate inheritance" was among the areas where such proof would be possible. *Id.* at 182 n.10.

¶ 28. Therefore, we conclude, the circuit court erred in concluding that WIS. STAT. § 893.88 precluded it from allowing or directing the personal representative to seek the court's determination of FBT's paternity. Moreover, while resolving this aspect of this appeal on this narrow basis, we also observe that nothing would have precluded the other parties, or the circuit court on its own motion, from gaining that determination. After all, in an age when DNA testing definitively addresses disputes like that of the instant case, *see* WIS. STAT. § 885.23, such a motion, in essence, seeks nothing more than the development and introduction of " '[r]elevant evidence' "—"evidence having any tendency to make the existence of *any fact that is of consequence to the determination of the action* more probable or less probable than it would be without the evidence." WIS. STAT. § 904.01 (emphasis added). Nothing could be of greater "consequence to the determination" of lawful inheritance by intestate succession than evidence establishing whether persons claiming to be heirs have the requisite relationship to the deceased.[12]

---

[12] The underlying principle is unremarkable. After all, as discussed at oral argument before this court, myriad "motions" in a variety of proceedings may advance a court's search for truth even though separate "actions" to establish the same propositions might be foreclosed. For example, evidence of whether one person battered another could be relevant in a civil action long after a statute of limitations foreclosed the filing of a criminal charge. And evidence of damages caused by a predecessor tortfeasor's negligence could be relevant to the determination of damages recoverable from a successor tortfeasor even if claims against the predecessor were barred by a statute of limitations. Motions to introduce such evidence would be unaffected by statutes of limitations.

## 2. The Personal Representative's Discretion

¶ 29. A personal representative *"may* bring a[ ] ... motion ... for the purpose of determining ... paternity." *See* WIS. STAT. § 767.45(1)(e) (emphasis added). The appellants do not dispute, therefore, that the personal representative's duty to do so was discretionary. They do, however, challenge the circuit court's conclusion that the personal representative's "disinclination to initiate paternity proceedings ... [was] reasonably based." The appellants are correct.

¶ 30. WISCONSIN STAT. § 863.23 in relevant part provides, "In every administration of an estate in which notice to creditors is required, except in proceedings under ch. 865 [relating to probate—informal administration], *the persons who are the heirs of the decedent shall be determined* by the court after hearing." (Emphasis added.) This mandatory responsibility supports the solid principles the supreme court proclaimed many years ago:

> From time immemorial it has been held by English-speaking peoples that *the property of intestate deceased persons should descend to kindred of the blood.* This is not a conclusion arrived at by application of principles of logic, but it is a tenet of justice, intuitively and generally recognized, and crystallized into forms of law by common consent. It formed the basis for the principles of descent obtaining at common law and finds expression in the statutes of descent enacted in the various states of the Union. It goes without saying that *any statute which interferes with that principle or interrupts the natural course of descent of property should be strictly construed, not only because it contravenes the common law but because it is repugnant to*

*fixed notions of natural justice; and this is especially true in this state, where it is held that the right to inherit property is a natural right which the legislature cannot destroy."*

*Estate of Bradley v. Tweedy*, 185 Wis. 393, 395–96, 201 N.W. 973 (1925) (emphasis added), *overruled in part by Estate of Nelson v. Hogie*, 266 Wis. 617, 619, 64 N.W.2d 406 (1954). Certainly, therefore, construing the discretionary authority of a personal representative under WIS. STAT. § 767.45(1)(e) in a way that prevents the definitive determination of heirs would be anything but strict; it would undermine the *Estate of Bradley* principles and defeat a court's responsibility under § 863.23.

¶ 31. " 'In administering the property of an intestate,' " a personal representative's " 'functions . . . are in the nature of those of a trustee, and he [or she] has at all times the right, and in many instances [the] duty, to apply to the court for direction and guidance.' " *Estate of Eannelli v. Eannelli*, 274 Wis. 193, 204, 80 N.W.2d 240 (1956) (quoted source omitted). Where rights are in doubt, failure to seek such additional direction " 'is very unwise.' " *See id.* Here, such direction was readily available pursuant to WIS. STAT. § 885.23, which provides:

> **Genetic tests in civil actions.** *Whenever it is relevant in a civil action to determine the parentage or identity of any child, person or corpse, the court, by order, shall direct any party to the action and any person involved in the controversy to submit to one or more genetic tests as* provided in s. 767.48 [related to genetic tests in paternity actions]. *The results of the tests shall be receivable as evidence in any case where exclusion from parentage is established or where a probability of parentage is shown to exist.* Whenever the court orders the genetic

> tests and one of the parties refuses to submit to the
> tests that fact shall be disclosed upon trial.

(Emphasis added.)

¶ 32. Thus, we conclude, the circuit court erred in determining that the personal representative's discretionary decision was reasonable. Clearly, the personal representative's decision was unreasonable, given that it was based on: (1) her misinterpretation of the preclusive impact of the statute of limitations; (2) her mere hope, expressed in her letter to the court commissioner, that her understanding of FBT's wishes could be honored, notwithstanding her knowledge of law prohibiting anything other than escheat; and (3) her failure to recognize the legal means available to determine FBT's paternity and, therefore, the identity of his heirs. *See* 2 James B. MacDonald, WISCONSIN PROBATE LAW AND PRACTICE § 14A:9 (8th ed. 1996); *see also* A HANDBOOK FOR PERSONAL REPRESENTATIVES, 5, WIS. BAR REAL PROPERTY, PROBATE & TRUST LAW SEC. (1991) (A personal representative has the responsibility to "[d]etermine the names, ages, residences and degree of relationship of all possible heirs.").

## C. The Circuit Court Correctly Declined to Remove the Personal Representative

■

¶ 33. While we agree with the appellants' primary challenge to the personal representative's discretionary decision, and while we understand their frustration with the costly battle that has prevented the determination they fairly seek, we are unable to conclude that the circuit court erred in declining to remove her.

¶ 34. As noted, WIS. STAT. § 857.15 provides, in part, that when a personal representative becomes

"unsuitable" or "incapable of discharging the personal representative's duties," a court "shall remove the personal representative." Further, the statute states that when a personal representative "has failed to perform any duty imposed by law or by any lawful order of the court . . ., the court may remove the personal representative." *Id.* And "[w]hen grounds for removal appear to exist, the court on its own motion or on the petition of any person interested shall order the personal representative to appear and show cause why the personal representative should not be removed." *Id.*

¶ 35. In its decision, the circuit court noted that "[n]either party addressed this issue in court" and, in fact, the court never found that "grounds for removal appear to exist," *see* WIS. STAT. § 857.15, or held a show-cause hearing under the statute. Denying the appellants' request, however, the circuit court noted the substantial efforts of the personal representative to locate any heirs FBT might have had, and commented that she "did not waver from her duty to protect the estate from invalid claims." The court concluded that the personal representative had "discharged her responsibilities diligently."

¶ 36. Notwithstanding their serious disagreements with the personal representative's approach, the appellants have not demonstrated that her decisions derived from fraud, bad faith, or conflict of interest. *See Estate of Eannelli*, 274 Wis. at 202–03 (removal of estate's administratrix appropriate where she had "a manifest conflict in interest between the roles played by her as an heir interested in the outcome of the litigation and as administratrix"). They have not shown that she had become incompetent, unsuitable, or incapable of discharging her duties. *See* WIS. STAT. § 857.15.

¶ 37. Finally, although we have concluded that the personal representative misinterpreted law in several significant ways and, as a result, failed to fulfill her fundamental duty to identify FBT's heirs, we recognize that she did so based on her assessment of what the law allowed—an assessment the circuit court embraced. Erroneous assessments of law, reached in good faith, do not establish any basis for removal under WIS. STAT. § 857.15. Now, with the legal guidance gained through this appeal, the personal representative will fulfill her duties and, we trust, do so with a concerted effort to minimize the costs to an estate that, in all likelihood, already has incurred considerable costs that could have been avoided.

*By the Court.*—Order affirmed in part; reversed in part and cause remanded with directions.