# SUPREME COURT OF WISCONSIN

| | |
|---|---|
| CASE NO.: | 2016AP2082 & 2017AP634 |

| | |
|---|---|
| COMPLETE TITLE: | Kathleen Papa and Professional Homecare Providers, Inc., <br>          Plaintiffs-Respondents-Petitioners, <br>    v. <br> Wisconsin Department of Health Services, <br>          Defendant-Appellant. |

REVIEW OF DECISION OF THE COURT OF APPEALS
Reported at 388 Wis. 2d 474,934 N.W.2d 568
(2019 – unpublished)

| | |
|---|---|
| OPINION FILED: | July 9, 2020 |
| SUBMITTED ON BRIEFS: | |
| ORAL ARGUMENT: | March 18, 2020 |

| | |
|---|---|
| SOURCE OF APPEAL: | |
|    COURT: | Circuit |
|    COUNTY: | Waukesha |
|    JUDGE: | Kathryn W. Foster |

JUSTICES:

ZIEGLER, J., delivered the majority opinion of the Court, in which ROGGENSACK, C.J., and ANN WALSH BRADLEY and DALLET, JJ., joined, and in which REBECCA GRASSL BRADLEY and KELLY, JJ., joined except for ¶¶46-48; KELLY, J., filed an opinion concurring in part and dissenting in part, in which REBECCA GRASSL BRADLEY, J., joined.

NOT PARTICIPATING:

HAGEDORN, J. did not participate.

ATTORNEYS:

For the plaintiffs-respondents-petitioners, there were briefs filed by *Diane M. Welsh, Aaron G. Dumas,* and *Pines Bach LLP*, Madison. There was an oral argument by *Diane M. Welsh*.

For the defendant-appellant, there was a brief filed by *Steven C. Kilpatrick*, assistant attorney general; with whom on the brief was *Joshua L. Kaul*, attorney general. There was an oral argument by *Steven C. Kilpatrick*.

An amicus curiae brief was filed on behalf of Wisconsin Hospital Association, Inc., Wisconsin Medical Society, Inc, Wisconsin Dental Association, Inc, Pharmacy Society of Wisconsin, Inc., Wisconsin Health Care Association, Inc., Wisconsin Personal Services Association, Inc., and Leading Age Wisconsin, Inc. by *Sarah E. Coyne, Matthew Splitek, James Goldschmidt,* and *Quarles & Brady LLP*, Madison.

NOTICE

**This opinion is subject to further editing and modification. The final version will appear in the bound volume of the official reports.**

Nos. 2016AP2082 & 2017AP634
(L.C. No. 2015CV2403)

STATE OF WISCONSIN      :      IN SUPREME COURT

**Kathleen Papa and Professional Homecare Providers, Inc.,**

        **Plaintiffs-Respondents-Petitioners,**

     **v.**

**Wisconsin Department of Health Services,**

        **Defendant-Appellant.**

**FILED**

**JUL 9, 2020**

Sheila T. Reiff
Clerk of Supreme Court

---

ZIEGLER, J., delivered the majority opinion of the Court, in which ROGGENSACK, C.J., and ANN WALSH BRADLEY and DALLET, JJ., joined, and in which REBECCA GRASSL BRADLEY and KELLY, JJ., joined except for ¶¶46-48; KELLY, J., filed an opinion concurring in part and dissenting in part, in which REBECCA GRASSL BRADLEY, J., joined.

HAGEDORN, J., did not participate.

---

REVIEW of a decision of the Court of Appeals. *Reversed in part, affirmed in part, and remanded.*

¶1 ANNETTE KINGSLAND ZIEGLER, J. This is a review of an unpublished decision of the court of appeals in two consolidated cases, Papa v. Wisconsin Department of Health Services, Nos. 2016AP2082 & 2017AP634, unpublished slip op. (July 31, 2019),

reversing the Waukesha County circuit court's[1] orders granting summary judgment, declaratory relief, and injunctive relief in favor of plaintiffs, Kathleen Papa and Professional Homecare Providers, Inc. (hereinafter "PHP"), and granting supplemental relief and costs and attorney fees. The court of appeals reversed and remanded with orders to enter judgment in favor of the defendant, Wisconsin Department of Health Services (hereinafter "DHS").

¶2   This case requires this court to determine the scope of DHS's authority to recoup payments made to Medicaid service providers. PHP challenges DHS's recoupment policy, as it has been enforced against PHP nurses to recover payments made for services they provided to Medicaid patients. PHP argues that, after DHS has already paid nurses for covered and provided Medicaid services, its practice is to then audit nurses' records and seek to recover the payments if DHS finds any documentation shortcomings. According to PHP, DHS does not contest whether the nurse actually provided a Medicaid patient with the covered service for which the nurse was paid. Nor does it claim that the payment was inappropriate or inaccurate. Rather, it recoups payments nurses earned and received for their work because, after the fact, it claims the nurse's supporting records are not perfect. The issue in this case is whether DHS has the authority to enforce this recoupment policy. The short answer is no, it does not.

---

[1] The Honorable Kathryn W. Foster presided.

2

¶3   We conclude that PHP's challenge to DHS's recoupment policy is ripe for judicial determination. We conclude that, under Wis. Stat. § 49.45(3)(f)1.-2. (2017-18),[2] DHS may recoup Medicaid payments from service providers only in cases where DHS cannot verify one of the following: (1) the actual provision of covered services; (2) that the reimbursement claim is appropriate for the service provided; and (3) that the reimbursement claim is accurate for the service provided.   We further conclude that DHS's recoupment policy exceeds its recoupment authority.   Finally, we conclude that the circuit court's order for supplemental relief did not expand the scope of its original order, but that its order for costs and fees was erroneous.   Accordingly, we reverse in part, affirm in part, and remand.

## I.   FACTUAL BACKGROUND

¶4   The Medicaid Program provides free or low-cost health care for low-income people, families, and children, pregnant women, the elderly, and people with disabilities.   "'Medicaid is a cooperative federal-state program through which the Federal Government provides financial assistance to States so that they may furnish medical care to needy individuals.'" Newcap, Inc. v. DHS, 2018 WI App 40, ¶4, 383 Wis. 2d 515, 916 N.W.2d 173 (quoting Wilder v. Virginia Hosp. Ass'n, 496 U.S. 498, 502 (1990)). "[S]tates voluntarily opt into the federal scheme and thereby bind themselves to abide by the rules and regulations imposed by the

---

[2] All subsequent references to the Wisconsin Statutes are to the 2017-18 version unless otherwise indicated.

3

federal government in return for federal funding." Gister v. Am. Family Mut. Ins. Co., 2012 WI 86, ¶14, 342 Wis. 2d 496, 818 N.W.2d 880. The States administer Medicaid pursuant to federal requirements set forth in Title XIX of the Social Security Act. 42 U.S.C. §§ 1396-1396w-5. "The State of Wisconsin has joined the federal Medicaid system, and has consequently committed itself to following the federal law governing that system." Gister, 342 Wis. 2d 496, ¶14. DHS administers Wisconsin's medical assistance program. Wis. Stat. § 49.45(1).

¶5 DHS has Medicaid-related responsibilities, including those "relating to fiscal matters, the eligibility for benefits . . . and general supervision of the medical assistance program." Wis. Stat. § 49.45(2)(a)1. DHS is required to "reimburse providers for medically necessary and appropriate health care services . . . when provided to currently eligible medical assistance recipients." Wis. Admin. Code § DHS 107.01(1) (May 2019).[3] And, relevant to this case, federal law requires DHS to audit participating health care providers' records to ensure that all Medicaid payments are proper. See 42 U.S.C. § 1396a(a)(42)(A) ("[T]he records of any entity participating in the plan and providing services reimbursable on a cost-related basis will be audited as the Secretary determines to be necessary to insure that proper payments are made under the plan[.]").

---

[3] All subsequent references to Wis. Admin. Code DHS ch. 107 are to the May 2019 register date unless otherwise indicated.

4

¶6 Under Wisconsin law, DHS may conduct audits "to verify the actual provision of services or items available under the medical assistance program and the appropriateness and accuracy of claims for reimbursement submitted by providers participating in the program." Wis. Stat. § 49.45(3)(g)1. The Office of the Inspector General ("OIG") conducts audits for DHS. After an audit, DHS may recoup payments. DHS "shall" "recover money improperly or erroneously paid or overpayments to a provider." Wis. Stat. § 49.45(2)(a)10.a.; Wis. Admin. Code § DHS 108.02(9)(a) (Jan. 2019)[4].

¶7 PHP is a non-profit professional organization for independent nurses. Kathleen Papa and other PHP nurses are certified Medicaid service providers who work in independent practice and provide in-home care. When PHP nurses provide care for Medicaid patients, the nurses are reimbursed by Wisconsin's medical assistance program.

¶8 On December 14, 2015, PHP filed a complaint for declaratory and injunctive relief, challenging DHS's recoupment policy. PHP alleged that DHS sought:

> recoupment of monies paid to independent nurses for Medicaid-covered services the nurses actually provided, merely because post-payments audits have found that the services or documentation fail to meet any single one of numerous, evolving requirements set forth in federal and state law, updates issued by DHS, the online Medicaid Handbook, as well as other standards deemed relevant by individual auditors in DHS's [OIG].

---

[4] All subsequent references to Wis. Admin. Code DHS ch. 108 are to the January 2019 register date unless otherwise indicated.

5

Essentially, PHP alleged that it is DHS's practice to seek recoupment of payments already paid to nurses for covered services they actually provided, absent any assertion that the reimbursement claims for those services were either inappropriate or inaccurate, simply because a post-payment audit found that the nurse's records were not perfect. As a shorthand, we will refer to this alleged recoupment policy as DHS's "Perfection Policy."

¶9 PHP alleged that DHS's Perfection Policy was: (1) an unpromulgated rule under Wis. Stat. § 227.10; (2) "inconsistent with Chapter 49 of the Wisconsin [Statutes] and chapters DHS 107 and 108 of the Administrative Code"; and (3) an unconstitutional taking. PHP attached to the complaint a copy of Topic #66 from DHS's Medicaid Provider Handbook.[5] Topic #66 states:

> For a covered service to meet program requirements, the service must be provided by a qualified Medicaid-enrolled provider to an enrolled member. In addition, the service must meet all applicable program requirements, including, but not limited to, medical necessity, PA (prior authorization), claims submission, prescription, and documentation requirements.

PHP alleged that DHS's "statement of general policy" on recoupment exceeds its statutory authority.

---

[5] The "[p]rovider handbook" is "a publication developed by [DHS] for the use of providers which outlines program policies and includes instructions on claim filing and other aspects of participation in" the medical assistance program. Wis. Admin. Code § DHS 101.03(141) (May 2019); see also Wis. Admin Code § DHS 108.02(4) ("[DHS] shall publish provider handbooks, bulletins and periodic updates to inform providers of changes in state or federal law, policy, reimbursement rates and formulas, departmental interpretation, and procedural directives such as billing and prior authorization procedures, specific reimbursement changes and items of general information.").

¶10 On March 18, 2016, PHP moved for summary judgment. In support of its motion, PHP submitted affidavits from several nurses describing the Perfection Policy. Kathleen Papa and Shanda M. Hubertus, the past and current presidents of PHP, each stated:

> During audits of PHP members, I have observed that OIG has sought to recover Medicaid funds based on a finding of alleged minor noncompliance with a Medicaid Provider Update, a Handbook provision, an Administrative Code provision, or other standard or policy.

Nurses H.U., M.S., J.G., and G.R. stated that they each had been the subject of an OIG audit. OIG sought to recoup approximately $58,000, $15,000, $48,000, and $36,000 from each of them, respectively. The nurses alleged that the recoupments were "for care that OIG did not dispute was provided to a Medicaid patient, following OIG's prior authorization for the services." OIG did not contest that the nurses actually provided authorized services for which they were paid. Rather, OIG's recoupment efforts were based on "noncorrelation between the medication record, the record of treatment and the nurse's clinical notes." Nurse D.Z.-G. stated that OIG had sought to recoup about $58,000 from her because she "did not submit claims for reimbursement to the minor patients' parents' employer-based health plans despite the fact that it had previously been established that the employer-based health plans would not cover the private duty nursing services."[6]

¶11 Finally, counsel for PHP submitted an affidavit. He attached to it a DHS brief filed in another case, in which OIG

---

[6] DHS submitted an affidavit contesting Nurse D.Z.-G.'s allegations as "inaccurate" and "misleading."

7

sought to recoup money paid to a PHP nurse "merely because she did not counter-sign the Prior Authorization/Care Plan Attachment." In that case, DHS concluded its brief by asserting:

> A Medicaid provider may only be reimbursed for covered services if she meets all of the program requirements in the law, administrative rules, and applicable Medicaid Handbook provisions. . . . [Nurse N.M.] failed to countersign [the patient's] Care Plan before she provided the ordered nursing services.

> The Administrative Law Judge should find that the State of Wisconsin Department of Health Services is authorized to recoup $7,358.51 from [Nurse N.M.] for payment she received from the Medicaid program for non-covered services . . . .

Counsel for PHP also attached a final decision in another case where DHS successfully recouped $8,944.85 from Nurse S.M. for failure to counter-sign her patients' care plans or maintain documentation of required registered nurse supervision.

## II. PROCEDURAL POSTURE

¶12 The circuit court granted PHP's motion for summary judgment. On September 27, 2016, the circuit court determined the case was ripe for judicial determination and granted declaratory relief. It declared:

> [DHS's] authority under Wis. Stat. §§ 49.45(3)(f) and 49.45(2)(a)10[.] to recover payments from Medicaid providers is limited to claims for which either (1) [DHS] is unable to verify from a provider's records that a service was actually provided; or (2) an amount claimed was inaccurate or inappropriate for the service that was provided[.]

The circuit court further declared that DHS's recoupment policy "imposes a 'Perfection Rule' which exceeds [DHS's] authority," and

8

that this policy, including Topic #66, is "a rule not properly promulgated under Wis. Stat. § 227.10(1)."[7] The circuit court also "grant[ed] a temporary injunction enjoining [DHS] from applying or enforcing the Perfection Rule."[8]

¶13  On October 20, 2016, DHS filed a notice of appeal. Then, on January 12, 2017, PHP filed a motion for supplemental relief or for contempt of court. PHP asserted that DHS was violating the circuit court's declaratory judgment and injunction. The circuit court granted PHP's motion for supplemental relief. Pursuant to Wis. Stat. §§ 806.04(8) and 808.07(2)(a)3., the circuit court ordered:

> 1.   [DHS] shall not issue a notice of intent to recover Medicaid payments to, or otherwise recoup funds from, a Medicaid provider if the provider's records verify that the services were provided and the provider was paid an appropriate amount for such services, notwithstanding that an audit identified other errors or noncompliance with [DHS] policies or rules;
>
> 2.   [DHS] shall not further any agency action, including an administrative proceeding, currently underway in which [DHS] seeks to recoup Medicaid payments from a Medicaid provider, if the provider's records verify that the services were provided and the provider was paid an appropriate amount for such services, notwithstanding that an audit identified other errors or noncompliance with [DHS] policies or rules; and

---

[7] The circuit court referred to a "Perfection Rule." Because we make no determination whether the DHS's recoupment practice constitutes a rule, we refer to it as a "Perfection Policy."

[8] The circuit court also concluded that there was no unconstitutional taking. PHP did not pursue the takings claim on appeal, so we do not review that conclusion.

3.  [DHS]  shall  pay  the  Plaintiffs'  costs  and attorneys'  fees  incurred  for  prosecuting  this  Motion.

In  a  separate  order,  the  circuit  court  ordered  DHS  to  pay  PHP's "costs  and  attorneys'  fees  in  the  amount  of  $25,284.50."

¶14  DHS  filed  an  amended  notice  of  appeal  and  a  motion  to consolidate  its  appeals  of  the  circuit  court's  original  and supplemental  orders.   The  court  of  appeals  granted  the  motion  to consolidate.[9]  Then,  on  July  31,  2019,  the  court  of  appeals  reversed the  circuit  court  orders  in  a  split  decision.   Papa,  unpublished slip  op.,  ¶19.

¶15  The  majority  focused  its  analysis  exclusively  on  Topic #66.   It  declined  to  review  a  broader  recoupment  policy  because  it construed  PHP's  complaint  as  alleging  only  that  Topic  #66  was  an unpromulgated  rule.   Id.,  ¶12.   The  majority  concluded  that  Topic #66  "does  not  have  the  force  of  law  and  therefore  does  not constitute  an  administrative  rule."   Id.,  ¶17.   It  further  stated, "This  conclusion  leaves  PHP  without  a  basis  for  its  requested relief  pursuant  to  Wis.  Stat.  § 227.40(1)."   Id.,  ¶19.   The  dissent agreed  with  the  majority's  conclusion  that  Topic  #66  is  not  an administrative  rule.   Id.,  ¶20  (Reilly,  P.J.,  dissenting).   But, for  the  dissent,  whether  Topic  #66  is  a  rule  did  not  dispose  of the  case.   The  dissent  concluded,  "The  simple  fact  is  that  the circuit  court  found  that  DHS  was  enforcing  standards,  thresholds, and  requirements  found  in  Topic  #66  as  a  mechanism  to  take  [PHP's]

---

[9] DHS  also  filed  a  motion  to  stay  the  circuit  court's  orders pending  appeal,  but  the  circuit  court  denied  the  motion.

property without the legal right to do so. See Wis. Stat. § 227.10(2m)." Id., ¶21 (Reilly, P.J., dissenting).

¶16 We granted PHP's petition for review.

### III. STANDARD OF REVIEW

¶17 We review the court of appeals' decision reversing the circuit court's order granting PHP's motion for summary judgment. "'We review summary judgment rulings independently, applying the well-established standards set forth in Wis. Stat. § 802.08.'" Benson v. City of Madison, 2017 WI 65, ¶19, 376 Wis. 2d 35, 897 N.W.2d 16 (quoting Marks v. Houston Cas. Co., 2016 WI 53, ¶35, 369 Wis. 2d 547, 881 N.W.2d 309). Summary judgment is appropriate when there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law. Wis. Stat. § 802.08(2).

¶18 DHS argues that this case is not justiciable because it is not ripe. Ripeness is a question of law which we review de novo. Olson v. Town of Cottage Grove, 2008 WI 51, ¶38, 309 Wis. 2d 365, 749 N.W.2d 211.

¶19 This case requires us to determine the scope of DHS's authority to recoup payments made to Medicaid service providers. "The question of the scope of an agency's authority requires the interpretation of relevant statutes [and regulations], which presents a question of law, which we review de novo." Lake Beulah Mgmt. Dist. v. DNR, 2011 WI 54, ¶23, 335 Wis. 2d 47, 799 N.W.2d 73 (citing Anderson v. DNR, 2011 WI 19, ¶25, 332 Wis. 2d 41, 796 N.W.2d 1). We do not defer to agency interpretations. Wis. Stat.

11

§ 227.57(11) ("Upon review of an agency action or decision, the court shall accord no deference to the agency's interpretation of law."); see also Tetra Tech EC, Inc. v. DOR, 2018 WI 75, ¶108, 382 Wis. 2d 496, 914 N.W.2d 21. Statutory and regulatory interpretation begin and end with the language of the relevant statutes and regulations if their meaning is plain. State ex rel. Kalal v. Circuit Court for Dane Cty., 2004 WI 58, ¶45, 271 Wis. 2d 633, 681 N.W.2d 110.

¶20 We also review the court of appeals' reversal of the circuit court's supplemental order and order for costs and attorney fees. Whether a circuit court may order a state agency to pay costs and attorney fees is a question of law we review de novo. DOT v. Wisconsin Personnel Comm'n, 176 Wis. 2d 731, 735, 500 N.W.2d 664 (1993).

IV. ANALYSIS

A. The Issues Presented

¶21 PHP argues that the Perfection Policy is unlawful under Wis. Stat. § 227.40(1) for two reasons. PHP first argues that DHS's Perfection Policy is an unpromulgated administrative rule. Alternatively, PHP argues the Perfection Policy is an invalid guidance document. PHP also argues that the Perfection Policy, whether a rule, a guidance document, or neither, is unlawful because it exceeds DHS's statutory recoupment authority under Wis. Stat. § 49.45(3)(f). See Wis. Stat. § 227.10(2m). Finally, PHP argues that the circuit court's supplemental order and order for costs and attorney fees were proper.

12

¶22 DHS has several counter-arguments. It argues that this case is a review of Topic #66 specifically, and not a broader Perfection Policy. Regarding Topic #66, DHS argues that it is not a rule. It also argues that, even if Topic #66 is a guidance document, PHP's guidance document claim is not properly before this court. Regarding the Perfection Policy, DHS denies its existence. It also argues that PHP's claim is not ripe and that the alleged Perfection Policy is not a rule or guidance document. Next, DHS argues that neither Topic #66 nor the Perfection Policy exceeds DHS's recoupment authority. Finally, DHS argues that the circuit court's supplemental order was improper because it expanded the scope of the original order while DHS's appeal was pending. And it argues that sovereign immunity bars the circuit court's order for costs and attorney fees.

¶23 Accordingly, the parties present this court with a variety of issues. But we narrow them to three.[10] To do so, we clarify (1) the scope of the challenge (Topic #66 or the Perfection Policy), and (2) the proper inquiry (rule, guidance document, or excess of recoupment authority).

¶24 First, we must determine whether PHP's complaint challenged Topic #66 only or, more broadly, the Perfection Policy. Both the court of appeals and DHS view this case as a challenge to

---

[10] "Typically, an appellate court should decide cases on the narrowest possible grounds. State v. Blalock, 150 Wis. 2d 688, 703, 442 N.W.2d 514 (Ct. App. 1989). Issues that are not dispositive need not be addressed. Gross v. Hoffman, 227 Wis. 296, 300, 277 N.W. 663 (1938)." Maryland Arms Ltd. P'ship v. Connell, 2010 WI 64, ¶48, 326 Wis. 2d 300, 786 N.W.2d 15.

13

Topic #66 exclusively. Papa, unpublished slip op., ¶¶17, 19. But the complaint and the circuit court's original order both make clear that this case presents a review of DHS's Perfection Policy, not just Topic #66.

¶25 PHP's complaint alleged that DHS "has a 'statement of general policy' that [it] may recoup payment from Medicaid providers for covered services that have been provided, and for which Medicaid has reimbursed, if a post-payment audit finds that the services fail to meet all applicable program requirements." Topic #66 was attached to the complaint. But the complaint itself consistently refers not to Topic #66, but to a "statement of general policy." PHP's Claim Two alleges it is DHS's policy "that any compliance imperfection causes the services to be 'non-covered' and therefore an 'overpayment.'" PHP alleges that this policy "has no basis in regulation or statute" and "is in excess of DHS's authority." Accordingly, the complaint alleges that DHS's recoupment policy requires perfection and exceeds DHS's actual recoupment authority. The complaint is not limited to Topic #66.

¶26 Furthermore, the circuit court determined that Topic #66 is just an example of DHS's recoupment policy. It concluded that DHS's "recoupment policy" requires perfection. And it described the "recoupment policy" as "including the standard as set forth in the Medicaid Provider Handbook at Topic #66." (Emphasis added.) Thus, this case is not limited to a narrow review of Topic #66 only. This case presents a broader challenge to DHS's Perfection Policy, of which Topic #66 is just an example.

¶27 Second, we clarify what the proper inquiry is——whether the Perfection Policy is an unpromulgated rule, is a guidance document, or exceeds DHS's recoupment authority. The proper inquiry is whether the Perfection Policy exceeds DHS's recoupment authority. We need not decide whether the Perfection Policy is a rule or a guidance document.[11] It makes no difference in this case. Regardless, Claim Two of the complaint clearly alleged that the Perfection Policy is in excess of DHS's recoupment authority. DHS may not adopt a Perfection Policy if that policy is in excess of its recoupment authority. See Wis. Stat. § 227.10(2m). Accordingly, the scope of DHS's recoupment authority is the crux of this case.

¶28 Thus narrowed, the issues we review in this case are: whether PHP's Perfection Policy claim is ripe; whether the Perfection Policy is in excess of DHS's recoupment authority; and whether the supplemental order and order for costs and attorney fees were proper.

### B. Ripeness

¶29 DHS argues that PHP's challenge to the Perfection Policy is not justiciable because it is not ripe. "A court must be

---

[11] DHS disputes whether PHP's guidance document claim is properly before this court because PHP's complaint did not plead a guidance document claim. Nor could it have. The legislature amended Wis. Stat. § 227.40(1) to permit such a claim during the pendency of this appeal. See 2017 Wis. Act 369, § 65. PHP argues that it pled a § 227.40(1) claim and that the amendment should therefore apply retroactively to this case. But we need not decide whether that amendment would apply retroactively to this case because we need not decide whether the Perfection Policy is a guidance document.

presented with a justiciable controversy before it may exercise its jurisdiction over a claim for declaratory judgment." Olson, 309 Wis. 2d 365, ¶28. A controversy is justiciable when: (1) a "right is asserted against [a defendant] who has an interest in contesting it"; (2) the controversy is "between persons whose interests are adverse"; (3) the plaintiff has a "legally protectable interest" in the controversy; and (4) the controversy is "ripe for judicial determination." Id., ¶29 (citing Loy v. Bunderson, 107 Wis. 2d 400, 410, 320 N.W.2d 175 (1982)). "'If all four factors are satisfied, the controversy is "justiciable," and it is proper for a court to entertain an action for declaratory judgment.'" Id. (quoting Miller Brands-Milwaukee, Inc. v. Case, 162 Wis. 2d 684, 694, 470 N.W.2d 290 (1991)).

¶30 Ripeness is the only factor at issue here. The purpose of ripeness is "'to avoid courts entangling themselves in abstract disagreements.'" Olson, 309 Wis. 2d 365, ¶43 (quoting Miller Brands-Milwaukee, 162 Wis. 2d at 694). Courts resolve concrete cases, not abstract or hypothetical cases. That being said, "the ripeness required in declaratory judgment actions is different from the ripeness required in other actions" because declaratory judgments are prospective remedies. Id. A plaintiff need not prove an injury has already occurred. Id. Rather, the facts must be "sufficiently developed to allow a conclusive adjudication." Id. (citing Milwaukee Dist. Council 48 v. Milwaukee Cty., 2001 WI 65, ¶41, 244 Wis. 2d 333, 627 N.W.2d 866). "The facts on which the court is asked to make a judgment should not be contingent or uncertain, but not all adjudicatory facts must be resolved as a

16

prerequisite to a declaratory judgment." Id. (citing Miller Brands-Milwaukee, 162 Wis. 2d at 694-95).

¶31 We conclude that PHP's challenge to DHS's recoupment policy is ripe for determination, and therefore justiciable. There is nothing hypothetical, abstract, contingent, or uncertain about the experiences of PHP's nurses described in their affidavits. Nor is there anything hypothetical or abstract about the brief and final decision attached to PHP's counsel's affidavit. The record here is "sufficiently developed to allow a conclusive adjudication." Olson, 309 Wis. 2d 365, ¶43. The record supports a conclusion that DHS is actively enforcing a Perfection Policy against nurses to recoup payments for services that they actually provided to Medicaid patients. Accordingly, we proceed to the merits.

## C. Recoupment Authority

¶32 The crux of this case is the scope of DHS's recoupment authority. "No agency may implement or enforce any standard, requirement, or threshold, . . . unless that standard, requirement, or threshold is explicitly required or explicitly permitted by statute or by a [promulgated] rule . . . ." Wis. Stat. § 227.10(2m). Thus, DHS may not implement or enforce the Perfection Policy unless it is explicitly required or permitted to

17

do so by statute or a previously promulgated rule.[12] Id. We look to the statutes and promulgated DHS rules to determine the scope of DHS's explicit recoupment authority. We begin with the relevant statutes.

¶33 Wisconsin Stat. § 49.45(2) sets forth a series of DHS obligations in its administration of the medical assistance program. Under § 49.45(2)(a)10.a., DHS "shall,"

> [a]fter reasonable notice and opportunity for hearing, recover money improperly or erroneously paid or overpayments to a provider by offsetting or adjusting amounts owed the provider under the program, crediting against a provider's future claims for reimbursement for other services or items furnished by the provider under the program, or requiring the provider to make direct payment to [DHS] or its fiscal intermediary.

Accordingly, DHS has the authority, indeed the obligation, to recoup improper or erroneous Medicaid payments and overpayments. That grant of authority raises two questions: What makes a payment improper, erroneous, or an overpayment?; and, how does DHS so determine? We find the answers a little further down in the same statute.

---

[12] While the parties dispute whether the Perfection Policy is a rule, they agree that it was not promulgated as such. Accordingly, the Perfection Policy cannot be and is not a source of its own authority. See Wis. Stat. § 227.10(2m) ("No agency may implement or enforce any standard, requirement, or threshold, including as a term or condition of any license issued by the agency, unless that standard, requirement, or threshold is explicitly required or explicitly permitted by statute or by a rule that has been promulgated in accordance with this subchapter . . . .") (Emphasis added.)

¶34 Under Wis. Stat. § 49.45(3)(f)1., DHS may audit providers' records to ensure that Medicaid payments are not improper, erroneous, or overpayments:

> Providers of services under this section shall maintain records as required by [DHS] for verification of provider claims for reimbursement. [DHS] may audit such records to verify actual provision of services and the appropriateness and accuracy of claims.

§ 49.45(3)(f)1. Under the plain language of subd. 1., DHS may require service providers to maintain records, and may audit those records to ensure that services are actually provided and claims for reimbursement for those services are appropriate and accurate.

¶35 Under Wis. Stat. § 49.45(3)(f)2., the result of a subd. 1. audit determines DHS's authority to recoup payments:

> [DHS] may deny any provider claim for reimbursement which cannot be verified under subd. 1. or may recover the value of any payment made to a provider which cannot be so verified. The measure of recovery will be the full value of any claim if it is determined upon audit that actual provision of the service cannot be verified from the provider's records or that the service provided was not included in s. 49.46(2) or 49.471(11). In cases of mathematical inaccuracies in computations or statements of claims, the measure of recovery will be limited to the amount of the error.

§ 49.45(3)(f)2.

¶36 The plain language makes clear that DHS's audit and recoupment authority focus on the "actual provision" of covered services, "the appropriateness" of claims, and the "accuracy of claims." Wis. Stat. § 49.45(3)(f)1.-2. DHS may require service providers to "maintain records." § 49.45(3)(f)1. It "may audit such records to verify actual provision of services and the

appropriateness and accuracy of claims." Id. And it "may recover the value of any payment made to a provider which cannot be so verified." § 49.45(3)(f)2. (emphasis added). The "so verified" language, viewed in context, refers back to subd. (3)(f)1. Accordingly, the legislature explicitly granted DHS authority to recoup payment for Medicaid services only when an audit of a service provider's records cannot verify the "actual provision of services," "the appropriateness" of claims, and the "accuracy of claims."[13] § 49.45(3)(f)1.-2.; Wis. Stat. § 227.10(2m).

¶37 The plain language of Wis. Stat. § 49.45(3)(f)1.-2. does not explicitly require or permit DHS to enforce a Perfection Policy. We turn next to DHS promulgated rules.

¶38 DHS may "[p]romulgate rules to implement" its recoupment authority. Wis. Stat. § 49.45(2)(a)10.c. And it has. Under Wis. Admin. Code § DHS 106.02(9)(g) (Jan. 2014):[14]

> [DHS] may refuse to pay claims and may recover previous payments made on claims where the provider fails or refuses to prepare and maintain records or permit authorized [DHS] personnel to have access to records required . . . .

Under this section, DHS may recoup Medicaid payments if the service provider does not "prepare and maintain" records or refuses DHS access to them. This provision is consistent with Wis. Stat. § 49.45(3)(f)2., which permits DHS to recoup payments if the actual

---

[13] DHS has other audit and recoupment authority relating to hospitals and contractors under Wis. Stat. § 49.45(3)(f)2m. and 3., but those subdivisions are not at issue in this case.

[14] All subsequent references to Wis. Admin. Code DHS ch. 106 are to the January 2014 register date unless otherwise indicated.

provision of services cannot be verified. Put simply, DHS cannot verify the actual provision of services without a record of those services. We note that § DHS 106.02(9)(g) does not state that mere record imperfections of any kind may be grounds for recoupment. Rather, it states that the complete failure or refusal "to prepare and maintain records or permit authorized [DHS] personnel to have access to records" at all constitutes grounds for recoupment. § DHS 106.02(9)(g). The difference between imperfect records and no records at all is a significant one. Thus, § DHS 106.02(9)(g) does not explicitly require or permit DHS to enforce its Perfection Policy either.

¶39 Moving to another promulgated rule, Wis. Admin. Code § DHS 108.02(9)(a) describes recoupment methods:

> If [DHS] finds that a provider has received an overpayment, including but not limited to erroneous, excess, duplicative and improper payments regardless of cause, under the program, [DHS] may recover the amount of the overpayment by any of the following methods, at its discretion[.]

The recoupment methods include: (1) offsetting or adjusting other amounts owed the provider; (2) offsetting or crediting amounts owed for subsequent services; or (3) requiring the provider to pay the amount of overpayment. § DHS 108.02(9)(a)1.-3. This section describes the methods of recoupment, but does not provide any new information about the explicitly required or permitted grounds for DHS recoupment.

¶40 Based on the plain language of Wis. Stat. § 49.45(3)(f)1.-2. and Wis. Admin. Code § DHS 106.02(9)(g), DHS has explicit authority to recoup Medicaid payments only if DHS

21

cannot verify (1) the actual provision of covered services, (2) that the reimbursement claim is appropriate for the service provided, and (3) that the reimbursement claim is accurate for the service provided.

¶41 What remains is to compare this explicit grant of recoupment authority to DHS's Perfection Policy. Nowhere does Wis. Stat. § 49.45(3)(f)1.-2. say that the documents DHS requires must be perfect. Nowhere does § 49.45(3)(f)1.-2. or any DHS rule say that DHS may recoup payments from service providers based on any particular documentation shortcomings or imperfections. No statute or rule states that a particular documentation imperfection renders a claim inappropriate or inaccurate under § 49.45(3)(f)1.-2. Nor has DHS made any effort to link the Perfection Policy to an inability to verify that a covered service was actually provided, that the claim for the service was appropriate, or that the claim for the service was accurate. Absent any explicit authority to recoup payments based on the Perfection Policy, and absent any evidence that the Perfection Policy is linked to verification of covered services, claim appropriateness, or claim accuracy, we are left with a clear conclusion. There is no legal basis for the Perfection Policy.

¶42 We conclude that DHS's Perfection Policy has no basis under Wis. Stat. § 49.45(3)(f)1.-2.[15] No statute or promulgated rule explicitly requires or permits recoupment based on mere imperfection. Wis. Stat. § 227.10(2m). Rather, DHS may recoup Medicaid payments from providers only if it cannot verify the actual provision of covered services, the appropriateness of the claim for the services, and the accuracy of the claim for the services. § 49.45(3)(f)1.-2.; Wis. Admin. Code § DHS 106.02(9)(g). Thus, so long as DHS can verify that a covered service was actually provided, the claim was appropriate, and the claim was accurate, DHS cannot recoup payments based on a record imperfection. A record imperfection alone is not an independent basis for recouping payments. The Perfection Policy therefore

---

[15] DHS attempts to daisy-chain a plethora of state and federal statutes and codes to support the requirements set forth in Topic #66. DHS argues that Topic #66 "simply recites Medicaid law" under these provisions. See 42 U.S.C. §§ 1396a, 1396a(a)(19), (27), (30)(A), & (37); 42 C.F.R. §§ 430.0, 431.960(c), 440.230, 440.80, 447.45(d)(1) & (f), 455.18, 455.410, 455.412, 456.1-6; Wis. Stat. § 49.46(2)(b)6.g.; and Wis. Admin. Code §§ DHS 106.02(1)-(5), 106.03(2)(b), 107.02(2)(a), (e), (f) & (h), 107.03(9), 107.12(1)(c), (2)(a) & (4)(d). DHS's arguments regarding these provisions are underdeveloped. It does not engage in detailed statutory or regulatory interpretation. Nor does it point to a particular provision which would justify the Perfection Policy as a whole or the specific examples of it discussed in the affidavits filed in this case. DHS is, of course, bound by federal and state law. But we cannot develop DHS's arguments for it. See Clean Wis., Inc. v. Pub. Serv. Comm'n of Wis., 2005 WI 93, ¶180 n.40, 282 Wis. 2d 250, 700 N.W.2d 768 ("We will not address undeveloped arguments."). Rather, we note that we review the Perfection Policy, not just Topic #66, and that DHS has not directed us to any provision which explicitly establishes additional grounds for recoupment beyond those set forth in Wis. Stat. § 49.45(3)(f)1.-2.

23

exceeds DHS's recoupment authority. Wis. Stat. §§ 227.10(2m), 49.45(3)(f)1.-2.; § DHS 106.02(9)(g).

¶43 We note that the court of appeals recently came to a similar conclusion in Newcap, Inc. In that case, DHS argued that it had authority to recoup payment for services actually provided because Newcap "fail[ed] to retain invoices documenting its purchase of prescription drugs that it subsequently dispensed to Medicaid patients" and "fail[ed] to include correct National Drug Codes (NDCs)," a unique product code, "on reimbursement claims." Newcap, Inc., 383 Wis. 2d 515, ¶3. DHS did not link either of its arguments to an inability to verify the actual provision of covered services, the appropriateness of the reimbursement claim, or the accuracy of the reimbursement claim. The court of appeals rejected both arguments. It concluded that DHS "was not entitled to recoupment" in that case because there was no statute or rule explicitly stating that the failure to maintain prescription invoices or include the correct NDC was an independent basis for recoupment. Id., ¶45.

D. Supplemental Order And Order For Costs And Fees

¶44 When the court of appeals reversed the circuit court's original order in this case on the merits, it also automatically vacated the circuit court's supplemental order and order for costs and fees. Since we reverse the court of appeals on the merits, we must separately determine whether to reinstate the circuit court's other orders. DHS argues that the circuit court's supplemental order was improper because it expanded the circuit court's injunction while this appeal was pending before the court of

appeals. See Madison Teachers, Inc. v. Walker, 2013 WI 91, ¶¶2, 18-21, 351 Wis. 2d 237, 839 N.W.2d 388 (per curiam) (vacating a circuit court's contempt order because the order issued while an appeal was pending and "expanded the scope" of the circuit court's original declaratory judgment); Wis. Stat. § 808.075(3).

¶45 But the circuit court's supplemental order did not expand the scope of its original order. Rather, it clarified the original order. The circuit court's original order declared the Perfection Policy to be in excess of DHS's recoupment authority under Wis. Stat. §§ 49.45(2)(a)10. and (3)(f), and enjoined its enforcement. Its supplemental order specified that the injunction prohibited DHS from "issu[ing] a notice of intent to recover Medicaid payments," "further[ing] any agency action" or "otherwise recoup[ing] funds," "if the provider's records verify that the services were provided and the provider was paid an appropriate amount for such services . . . ." These specifications did not expand the scope of the original order. They merely clarified it. Thus, the circuit court did not err when it issued its supplemental order, and we reinstate it.

¶46 DHS also argues that the circuit court improperly awarded PHP costs and attorney fees. DHS argues that the circuit court's order for costs and attorney fees ran afoul of sovereign immunity. See Wis. Const. art. IV, § 27 ("The legislature shall direct by law in what manner and in what courts suits may be brought against the state.").

¶47 Because the State has sovereign immunity, "[t]his court has frequently held that costs may not be taxed against the state

25

or an administrative agency of the state unless expressly authorized by statute." Martineau v. State Conservation Comm'n, 54 Wis. 2d 76, 79, 194 N.W.2d 664 (1972) (collecting cases). Thus, the circuit court could not order DHS to pay PHP's costs and attorney fees unless "expressly authorized" by statute.

¶48 The circuit court cited two statutes as grounds for its supplemental order and order for costs and attorney fees, Wis. Stat. §§ 808.07(2)(a)3. and 806.04(8). Neither expressly authorizes a court to order costs and attorney fees. The former permits a circuit court to "[m]ake any order appropriate to preserve the existing state of affairs or the effectiveness of the judgment subsequently to be entered" while an appeal is pending. § 808.07(2)(a)3. And the latter permits a circuit court to grant "[f]urther relief based on a declaratory judgment" "whenever necessary or proper," but does not expressly include costs or attorney fees. § 806.04(8). The circuit court did not cite Wis. Stat. § 806.04(10) as authority for awarding costs and attorney fees. Under Wis. Stat. § 806.04(10), "In any proceeding under this section the court may make such award of costs as may seem equitable and just." While that subsection allows an award of costs generally, it does not expressly authorize an award of costs or attorney fees against the State. Thus, the circuit court erred

26

when it ordered DHS to pay PHP's costs and attorney fees.[16] We affirm the decision of the court of appeals on this single issue, and the order for costs and attorney fees must be vacated.

## V. CONCLUSION

¶49 We conclude that PHP's challenge to DHS's recoupment policy is ripe for judicial determination. We conclude that, under Wis. Stat. § 49.45(3)(f)1.-2., DHS may recoup Medicaid payments from service providers only in cases where DHS cannot verify one of the following: (1) the actual provision of covered services, (2) that the reimbursement claim is appropriate for the services provided; and (3) that the reimbursement claim is accurate for the services provided. We further conclude that DHS's recoupment policy exceeds its recoupment authority. Finally, we conclude that the circuit court's order for supplemental relief did not expand the scope of its original order, but that its order for costs and fees was erroneous. Accordingly, we reverse in part, affirm in part, and remand.

---

[16] PHP also argues that the circuit court properly ordered the costs and attorney fees as a sanction. But the circuit court did not find DHS in contempt or order costs and fees as a sanction. Its order says nothing of the sort. Indeed, at the hearing on this issue, the circuit court specifically declined to do so. The circuit court stated, "I will not enter a finding of contempt today against [DHS] . . . ." Absent a finding of contempt in the record, we will not review this argument.

*By the Court.*—The decision of the court of appeals is reversed in part, affirmed in part, and the cause is remanded to the circuit court for further proceedings consistent with this opinion.

¶50  BRIAN HAGEDORN, J., did not participate.

¶51 DANIEL KELLY, J. *(concurring in part, dissenting in part).* I join the majority except with respect to its denial of costs. The Department of Human Services ("DHS") says it enjoys immunity from the imposition of costs pursuant to Article IV, Section 27 of the Wisconsin Constitution, which says "[t]he legislature shall direct by law in what manner and in what courts suits may be brought against the state."[1] We've translated this into a ban on imposing costs against the state except when expressly authorized, but we've never been clear how this is connected to the constitutional command. Instead, it appears we stitched the principle together out of the historical genesis of costs as an awardable litigation expense and some passing references to the United States' sovereign immunity. Whether this pastiche fits together neatly is not something we need to resolve today; its historical development sufficiently demonstrates that the court may award costs against DHS pursuant to Wis. Stat. § 806.04(10).[2]

---

[1] The state's constitutional sovereign immunity applies to state agencies such as DHS. See, e.g., Mayhugh v. State, 2015 WI 77, ¶13, 364 Wis. 2d 208, 867 N.W.2d 754 ("Generally, for purposes of sovereign immunity, an action against a state agency or board is deemed an action against the state."); German v. DOT, 2000 WI 62, ¶18, 235 Wis. 2d 576, 612 N.W.2d 50 ("The state's sovereign immunity from suit extends to the state's agencies and arms.")

[2] Although the circuit court's award of costs and attorney fees did not cite Wis. Stat. § 806.04(10), appellate courts "may affirm on grounds different than those relied on by the trial court." Vanstone v. Town of Delafield, 191 Wis. 2d 586, 595, 530 N.W.2d 16 (Ct. App. 1995).

1

## I. ORIGIN OF "EXPRESS AUTHORIZATION"

¶52 A brief review of our cases addressing what it means for a statute to "expressly authorize" the award of costs against the state reveals this is more a matter of basic statutory construction than some type of heightened scrutiny called forth by the concept of sovereign immunity. In one of our earliest cases involving costs against the state, Noyes v. State, 46 Wis. 250, 1 N.W. 1 (1879), we resolved the issue without once mentioning sovereign immunity or our constitution. Our attention was captured, instead, by the interplay between common law and statutory law:

> At the common law, costs were unknown. Costs are altogether the creature of statute. Speaking of the statute of Glocester, 6 Edw. 1, Sir Edward Coke says: "Before this statute, at the common law, no man recovered any costs of sute, either in plea real, personal or mixt; by this it may be collected, that justice was good cheap of ancient times, for in King Alfred's time there were no writs of grace, but all writs remedialls granted freely." 2 Inst. 288. And no known statute gave costs against the crown.

Id. at 251-52. So we concluded that, "[i]n this state, therefore, costs are regulated exclusively by statute." Id. at 252. We were so far from considering this a matter of sovereign immunity that we actually suggested that costs may be awarded against the state when it permits itself to be sued: "As a rule, costs are given to the prevailing party in civil actions. And the statutes giving them, might include the state, when it sues or permits itself to be sued in civil actions." Id.

¶53 We introduced sovereign immunity to the question of costs in Sandberg v. State, 113 Wis. 578, 589, 89 N.W. 504 (1902), in which we said that "[n]o court is authorized to render judgment

2

for costs against the sovereign state, in absence of statute giving express authority." We based the part of the sentence addressing immunity, interestingly enough, not on our constitution but on what the United States Supreme Court said about the United States' immunity. Id. (collecting cases). The "express" aspect of this principle arose out of "the rule that general statutes are not to be construed to include, to its hurt, the sovereign." Id. This rebuffed our suggestion in Noyes that a general cost statute applicable to all litigants might, without more, be applicable against the state.

¶54 We said pretty much the same thing in Frederick v. State, 198 Wis. 399, 400, 224 N.W. 110 (1929), where we ruled that costs against the state are not allowed absent consent "manifested by an act of its Legislature . . . ." But the measure of how express that manifestation must be seems to have been looser than what the majority requires today. In Mr. Frederick's suit to recover unpaid salary under Wis. Stat. ch. 285 (1927) (actions against the state), there was no statute specifically allowing the court to award costs against the state. But Wis. Stat. § 285.04 (1927) required an audit of "the amount of damages and costs" paid in such an action.[3] The statute assumed, but did not say, that costs could be awarded.

---

[3] "Judgment, how paid: No execution shall issue against the state on any judgment, but whenever a final judgment against the state shall have been obtained in any such action the clerk shall make and furnish to the secretary of state a duly certified transcript of such judgment; and the secretary of state shall thereupon audit the amount of damages and costs therein awarded, and the same shall be paid out of the state treasury." Wis. Stat. § 285.04 (1927).

3

Nonetheless, we said "[t]his is sufficient to warrant the imposition of costs." Frederick, 224 N.W. at 110.

¶55 DHS calls our attention to DOT v. Wisconsin Pers. Comm'n, 176 Wis. 2d 731, 500 N.W.2d 664 (1993), and says we should deny costs here for the same reason we did there. But that case actually explains why costs should be awarded to Ms. Papa. The Wisconsin Pers. Comm'n court considered whether attorney's fees could be awarded against the state for a discovery violation under the auspices of Wis. Stat. § 804.12(1)(c). We held that, although the statute does allow for the award of fees, it does not explicitly refer to the state, and so there was no legislative consent. Wisconsin Pers. Comm'n, 176 Wis. 2d at 737-38. But we also pointed the way to the award of costs in that case when we noted that, unlike the discovery violation statute, "[t]he legislature has expressly authorized costs to be taxed against the state under other circumstances. See [Wis. Stat. §§] 227.485 and 814.245." Wisconsin Pers. Comm'n, 176 Wis. 2d at 738. Our reference to the first of the two cited statutes is particularly instructive here because it provides that the state is subject to costs in contested cases when an administrative agency's position does not prevail. As I explain below, costs must be available in declaratory judgment actions just as they are in contested cases because one type of action is simply an analog of the other.

II. THE SYMMETRY OF DECLARATORY JUDGMENTS AND CONTESTED CASES

¶56 In a declaratory judgment action, such as the one here, the natural alignment of parties is the reverse of what they would be had the action commenced as a contested case. See, e.g., Lister

4

v. Bd. of Regents of Univ. Wis. Sys., 72 Wis. 2d 282, 307, 240 N.W.2d 610 (1976) (explaining that a declaratory judgment action allows a party to bring an action to settle "controversies of a justiciable nature" before "a wrong has been threatened or committed" against that party so as to provide "a remedy which is primarily anticipatory or preventative in nature."). Our statutes unquestionably allow costs in the latter, and the authorization is only marginally less express in the former. Because the subject matter of both proceedings is essentially identical (albeit in different fora), with only the parties' positions being reversed, it would take an active imagination to surmise that the legislature provided consent to the imposition of costs in one type of case but not its functional analog.

¶57 Ms. Papa was the plaintiff here only because she took the initiative to commence the proceedings. If she had waited for DHS to commence a contested case for the payments at issue, she would have been the defendant. In that setting, it is beyond question that costs against the state are potentially available if the administrative agency's position fails:

> In any contested case in which an individual, a small nonprofit corporation or a small business is the prevailing party and submits a motion for costs under this section, the hearing examiner shall award the prevailing party the costs incurred in connection with the contested case, unless the hearing examiner finds that the state agency which is the losing party was substantially justified in taking its position or that special circumstances exist that would make the award unjust.

Wis. Stat. § 227.485(3).

5

¶58 In the same subchapter that provides for those costs, the legislature authorized those like Ms. Papa to bring a declaratory judgment action challenging an agency's rule instead of waiting for an agency to commence a contested case: "Except as provided in sub. (2) [the terms of which are not material here], the exclusive means of judicial review of the validity of a rule or guidance document shall be an action for declaratory judgment as to the validity of the rule or guidance document brought in the circuit court . . . ." Wis. Stat. § 227.40. An "action for declaratory judgment" is a phrase of art and, presumably, the legislature's institutional memory runs far enough back to remember when it adopted the Uniform Declaratory Judgment Act in 1927 (now codified at Wis. Stat. § 806.04). Ch. 212, Laws of 1927. And in that statute, we find the mandate that "[i]n any proceeding under this section the court may make such award of costs as may seem equitable and just." Wis. Stat. § 806.04(10).

¶59 The legislature expressly chose to subject the state to a proceeding in which costs could be awarded. The question is whether, in doing so, it manifested consent to the imposition of costs "as may seem equitable and just." I think it did. There is a basic symmetry between contested cases and declaratory judgment actions, in which the only differences are the venue and the parties' relative positions. The subject matter is the same, and the overall purpose is the same. There is no doubt about the availability of costs in a contested case, and Wis. Stat. § 806.04(10) says they are available in declaratory judgment actions. Given that context, the allowance of costs in the latter

6

is sufficient to satisfy the judicially-created "express authorization" standard. For these reasons, I respectfully dissent from ¶¶46-48 of the court's opinion concluding that DHS has sovereign immunity as to the costs awarded in favor of the petitioners.

¶60 I am authorized to state that Justice REBECCA GRASSL BRADLEY joins this concurrence/dissent.